## A. S. Busby v. The State.

### No. 3438. Decided March 6, 1907.

**1.—Misapplication of Public Money—Indictment—Repugnancy.**

In a prosecution for the misapplication and conversion of public money, there was no repugnancy because the indictment charged the defendant was an officer of the government and a clerk and employee of such officer; he being the assistant financial agent and subordinate of the financial agent of the penitentiary; besides the motion to quash was made after the verdict and came too late unless there was an absolute repugnancy in the indictment.

**2.—Same—Evidence, Checks as Evidence.**

Upon trial for misapplication of public funds, there was no error in permitting the State to introduce checks which were turned over to the bank and collected by it.

**3.—Same—Evidence—Endorsement of Check.**

In a prosecution for a misapplication of public funds, there was no error in permitting the introduction in evidence of checks which were made payable to the financial agent of the penitentiary and endorsed by the defendant officially, to show that they were the funds of the State.

**4.—Same—Evidence—Rejecting Testimony.**

Upon trial of misapplication of public funds there was no error to refuse testimony with reference to goods which were not charged against the defendant.

**5.—Same—Limitation—Evidence—Items Barred not Evidence.**

Upon trial for the misapplication of public funds, where items were introduced in evidence that were questioned as being barred by limitation, the jury

should have been instructed to disregard all such items so barred by the statute of three years limitation.

### 6.—Same—Books—Evidence—Supervision and Control by Defendant.

Upon trial for a misapplication of public funds, books offered in evidence against defendant must be shown to have been kept by him, or under his direct supervision and control; unless other proof is offered that said books were properly kept and that they were books of original entries.

### 7.—Evidence—Judgment in Civil Case not Evidence in Criminal Case.

Upon trial for misapplication of public funds, it was error to admit in evidence the judgment rendered in a civil case against defendant, in which the State of Texas was plaintiff and the financial agent of penitentiaries and his bondsmen and the defendant were defendants, involving the defalcation of public funds by the defendant, and which such suit was compromised and a judgment by consent rendered against the defendants in said suit, including the defendant; as the rules of evidence are different in the two proceedings. Brooks. Judge, dissenting.

### 8.—Same—Materiality—Injury to Defendant's Rights.

Upon trial for misapplication of public funds, where a judgment in a civil case against the defendant, involving the same subject matter was admitted in evidence, and the court instructed the jury that if the evidence showed that defendant was in default, a subsequent settlement would be no defense, etc., the same must have injuriously affected the rights of the defendant, although there was other evidence of his defalcation in the case.

### 9.—Same—Evidence—Expert Book-Keeper—Report.

Upon trial for a misapplication of public funds, there was no error in admitting in evidence the report of two expert book-keepers who were appointed to examine the books and make a report between the defendant and the State.

### 10.—Same—Evidence—Credit—Acts of Defendant.

Upon trial for a misapplication of public funds, there was no error in the refusal of the court to admit testimony as to an investigation made by defendant's witness to show that defendant had never made a claim to certain credits, to meet the testimony of the bank books that he had made such claim; no correction of the bank account having been previously requested by defendant.

### 11.—Same—Circumstantial Evidence—Charge of Court.

Upon trial for the misapplication of public funds, where the evidence is circumstantial, the court should charge on that phase of the case.

### 12.—Same—Charge of Court—Elements of Offense—Burden of Proof.

Upon a trial for the misapplication of public funds, the court correctly enumerated the essential elements constituting the offense, and placed the burden upon the State to show said requisites before the jury would be authorized to convict.

### 13.—Same—Conversion—Payment—No Extenuation.

Upon trial for a misapplication of public funds, where there was evidence that appellant's bondsmen repaid some of the funds after the conversion, the court correctly charged that this was no defense to the criminal prosecution.

### 14.—Same—Charge of Court—Accounting for Public Money—Officer.

The rule is that where a public State officer is shown to have received money on account of his trust, it is incumbent on him to pay it over to the State in accordance with the obligation assumed by him; and where exculpatory evidence of an important character is peculiarly within the knowledge of defendant it is his duty to produce it, and a charge embodying this principle was proper.

### 15.—Same—Charge of Court—Mixing Funds—Fraudulent Intent—Mistake.

Where upon trial for misapplication of public funds, there was evidence that the defendant was misled by the failure of a bank to report to him certain collections and which he failed to report to his principal, and that he mingled his private funds with public funds in such a manner that it might

not be tantamount to fraud on his part, the court should have instructed pertinently and directly as to his defense of mistake and innocent intent. Brooks, Judge, dissenting.

Appeal from the District Court of Houston. Tried below before the Hon. Benjamin H. Gardner.

Appeal from a conviction of misapplication and conversion of public money; penalty, three years imprisonment in the penitentiary.

The opinion states the case.

*Johnson & Edwards, H. N. Atkinson,* and *Adams & Adams,* for appellant.—The court erred in holding that the trial court correctly admitted the evidence of the judgment rendered in the civil suit of the State v. Hill et al., wherein the State sued to recover of Hill and his bondsmen civilly the alleged shortage of appellant. Such evidence was inadmissible for any purpose whatever, and especially was it incompetent to establish a prima facie case against appellant of a defalcation or indebtedness to the penitentiary. Britton v. State, 77 Ala., 202; Riker v. Hooper, 35 Vt., 457, S. C. 82 Am. Dec., 646; State v. Bradnack (Conn.), 37 At. Rep., 492; People v. Leland, 73 Hun, 162 (25 N. Y. Supp., 943); Dunagain v. State, 38 Texas Crim Rep., 614; People v. Kenyon, 93 Mich., 19, S. C. 52 N. W. Rep., 1,033; People v. Beevers, 99 Cal., 286, S. C. 33 Pac. Rep., 844; 2 Black on Judgd., sec. 529. See also U. S. v. Jaedicke, 73 Fed. Rep., 103, and Stone v. U. S., 64 Fed. Rep., 671.

The trial court must charge the law of the case presenting and covering every defensive issue by an affirmative charge and not merely in a negative manner, especially where an instruction is asked presenting the matter; and in this case the court erred in failing to submit to the jury the issue made by the evidence, to wit, that whatever shortage in his accounts may have been shown, the same was the result of mistake or oversight and was not intentional and designed. Reynolds v. State, 8 Texas Crim. App., 414; Burkhard v. State, 18 Texas Crim. App., 619; Reed v. State, 9 Texas Crim. App., 320; Greta v. State, 9 Texas Crim. App., 434; Henry v. State, 9 Texas Crim. App., 362; Jackson v. State, 15 Texas Crim. App., 88; White v. State, 18 Texas Crim. App., 63; Irvine v. State, 20 Texas Crim. App., 41; Wimberly v. State, 22 Texas Crim. App., 510; Bond v. State, 23 Texas Crim. App., 181; Garza v. State, 38 Texas Crim. Rep., 317; Boyd v. State, 18 Texas Crim. App., 344; Stocksbury v. Swann, 85 Texas, 563; Charles v. State, 36 Fla., 701.

On question of charge on limitation: Wyers v. State, 22 Texas Crim. App., 261; McCall v. State, 14 Texas Crim. App., 353. On question of admitting checks in evidence: Lewis v. State, 12 S. W. Rep., 736. On question of accounting: Steagald v. State, 22 Texas Crim. App., 491; Drinkveter v. State, 16 Texas Crim. App., 72; Johnson v. State, 30 Texas Crim. App., 421; Moore v. State, 28 Texas Crim. App., 377. On question of burden of proof: Ainsworth v. State, 8 Texas Crim. App., 532; Dubose v. State, 10 Texas Crim. App., 254; Leura v.

State, 12 Texas Crim. App., 259; Jones v. State, 13 Texas Crim. App., 14. On question of admitting books in evidence: 2 Enc. of Evidence, 665; Rayne v. Taylor, 12 La. Ann., 765; Underwood v. Parrott, 2 Texas, 172; Townsend v. Coleman, 18 Texas, 421.

*Howard Martin,* Assistant Attorney-General, for the State.—On question of report by expert accountants: Findley v. State, 14 S. W. Rep., 185; Masonic Lodge v. Lackland, 10 S. W. Rep., 895; Hollingsworth v. State, 111 Ind., 289. On question of indictment: Nicholas v. State, 23 Texas Crim. App., 317; Pisano v. State, 34 Texas Crim. Rep., 63; Rumage v. State, 55 S. W. Rep., 64. On question of mistake and fraudulent intent: People v. McKinney, 10 Mich., 54; Jaimes v. State, 32 Texas Crim. Rep., 473; 28 Am. & Eng. Enc. of Law, 1064; Jackson v. State, 6 Texas Ct. Rep., 153; Bridges v. State, 8 Texas Crim. App., 145; Leonard v. State, 7 Texas Crim. App., 417. Upon question of conversion of checks: Leach v. State, 10 Texas Ct. Rep., 850. Upon question of repaying embezzled money: Goodwyn v. State, 3 Texas Ct. Rep., 28; State v. Noland, 19 S. W. Rep., 715; Fleener v. State, 58 Ark., 98. On question of misapplication of funds and criminal intent: Art. 97, Penal Code of Texas; State v. Brooks, 42 Texas, 62; Hemingway v. State, 68 Miss., 414.

HENDERSON, JUDGE.—Appellant was convicted of misapplication and conversion of public money, and his punishment fixed at confinement in the penitentiary for a term of three years; hence this appeal.

In order to present the legal questions which appellant makes, it becomes necessary to state the case. The record is lengthy and contains much that is calculated to mislead and confuse. Without going into elaborate details, we will summarize what is considered to be the essential features of the case, as made by the State; and then the defenses set up by appellant.

Appellant became what is termed the assistant financial agent of the Rusk penitentiary in 1899. In effect he was subordinate and clerk of W. M. C. Hill, the financial agent of penitentiaries, appointed by Governor Sayers. Appellant qualified and entered on his duties in February of said year. His duties as such agent were to manage the financial affairs of the Rusk penitentiary; to buy supplies for the same, and to sell the products manufactured at said penitentiary; to pay out and receive moneys on said accounts, and to keep a correct account thereof, and to furnish monthly itemized statements of receipts and disbursements to the financial agent. His duty was to keep an account of every item bought and sold, with the price paid for the same, or the price for which the same was sold; and to keep the same correctly, and to keep the moneys accruing from the business of said penitentiary, to pay over to the financial agent the excess of receipts over expenditures as might be required. The indictment charged him as such agent with the em-

bezzlement of funds received in the amount of $7,500, which he had not accounted for.

In the evidence supporting this allegation, the State introduced three separate features, showing in different modes receipts by appellant and unaccounted for. (1) The State showed distinct items or charges of separate amounts received by him. These items included drafts and vouchers collected, beginning sometime in August, and aggregating about $6,000. This includes the difference in the International and Great Northern Railroad account, between the moneys collected and moneys reported, of $854.76, which appears to have been collected before the 17th of June, 1901. And includes the Texas and Pacific Railroad account, which appears to have been collected prior to said last named date. And includes the difference in the Cotton Belt's account, collected and reported, which was $856.41.

(2) The State showed by the bookkeepers appointed to audit said account that appellant during his term of office was short some $26,000. In this connection it was also shown by these experts that appellant claimed to have some $13,000, which he alleged was his private money, and belonged to him individually, and allowing his claim, they agreed that he was short some $12,000. They further stated there was some $3,000 that they were not entirely satisfied about as charged against appellant, and allowing this, he was indebted to the State $9,000, for which he made no showing.

(3) It was also shown that subsequent to appellant's term of office, suit had been brought against his principal, W. M. C. Hill, on account of his default. That Hill made appellant a party-defendant, and in case judgment was rendered against him (Hill) he asked judgment against appellant, and the sureties on the bond, which appellant had executed to him for the safe conduct of his office. An auditor was appointed by the court trying the case, and he reported a deficit of some $6,000. This was subsequently compromised, and a judgment rendered for $4,200 against said Hill; and also against this appellant and his sureties.

Against this demand of the State, appellant introduced some evidence challenging some of the State's separate items—it being proved by him that it was the custom between the bank and himself, when he gave a check or draft to the bank to be collected, that it was not to be charged as moneys received by the bank on his account, until the bank reported the collection thereof to him, and then it was made a charge against him; and that as to these particular items the bank made no report to him up to the time of his going out of office, and consequently they were not a charge against him. However, it was shown as to all these items, to wit:

> Hines Lumber Company......................$520.60
> Dallas Waterworks drafts..................... 327.00
> And the other Dallas Waterworks item.........

that while these were not reported to appellant at the time as collected, they were in fact collected, and were a proper charge against him.

Appellant also showed that he was not required to keep the money at any particular bank, and he was not required to pay it over at any particular time; that he kept said money at three different banks, to wit: at the Rusk National Bank, and the Gatesville Bank, and Center Bank. That in connection with his account for the penitentiary, he kept his private account of moneys belonging to him, and drew drafts promiscuously for the penitentiary and on account of his individual undertakings; and that on a proper accounting he was not indebted to the State in any amount; that really the State was indebted to him. In this connection he introduced in evidence a statement of accounts between him and the expert bookkeepers appointed to audit his books and accounts. This statement showed that his private moneys, on account of his private business, more than offset the account of the State against him. In other words, the State had received the benefit of some $26,370 private funds; that this account was made out by Walker, who succeeded him, and the suggestion is that it was agreed to as a correct account.

The State answered this by showing from Walker, that he knew nothing of the items claimed as offsets by appellant; that appellant made the statement to him, and the amounts were put down, and that he added these up, and it amounted to the offsets claimed by appellant as against the State's account of defalcation. On cross-examination of appellant as to these items, the following appears:

"Q. According to your contention these items that you listed and gave to Walker, and figured up $26,000 was all your money? A. I did not say so.

"Q. From the books that you have gone through, how much money does the State of Texas owe you, is it about $13,000? A. No, sir, it would be $25,362.96, or this other amount of $26,846.18. The first amount is the amount claimed as my shortage by the expert accountants.

"Q. So, when you left the State of Texas, and went to Shreveport, the State of Texas really owed you a large sum of money? A. I did not know anything about it.

"Q. Did you not keep your books so you could tell whether the State owed you or you owed the State? A. No, sir, I could not tell anything about it. I am not a clerical man." * * *

"Q. Why would you use your private funds for the State? A. Every time we would make out a report I would be guided entirely as to the amount that report called for as to how I stood.

"Q. You intended to be honest with the State of Texas, did you? A. Yes, I did.

"Q. You knew when you turned over the office you would have to settle according to the books in the office? A. Yes, sir.

"Q. Why did you say that your books and reports were correct,

unless you knew that was so.  A.  I conducted the affairs of the office as well as I possibly knew how.  I never suspected there was anything wrong at the office until these things came up.

"Q.  Why did you not keep the State's money and your own money separately in the bank?  A.  I never apprehended any trouble from any source of that kind.  I thought the books of the penitentiary would show what I was due the penitentiary.

"Q.  Is that the way you do business when you handle two men's money, to mix them up in the same account?  A.  That was not handling two men's money.  I did not have any, it seems.

"Q.  Whose was this $26,000?  A.  I could not tell you to save my life how that was.

"Q.  You could not tell how much money you had.  A.  I am going to examine these two bank accounts, and I am going to try to see if I can dissect these and tell which was which, and all about it.  I have mighty near done it as it is, but there is more in that Center account of borrowed money than has been represented."

Further, appellant when asked, "How he came to have separate moneys or funds to put in bank," accounted for the same in this wise:

| | |
|---|---:|
| That he realized from the sale of his home in Gatesville....$ | 1,000.00 |
| From the sale of his drug business at Gatesville.......... | 1,100.00 |
| That he borrowed from the Gatesville Bank on his note.... | 688.20 |
| Borrowed from a convict, named Guyton................ | 1,100.00 |
| Sold some pig-iron, and made a profit of................ | 800.00 |
| Borrowed from the San Augustine Bank................. | 1,800.00 |
| Borrowed from the Center Bank....................... | 1,000.00 |
| The Brick Company owed him........................ | 2,200.00 |
| Estimated collections from the drug-accounts at Gatesville.. | 1,500.00 |

$11,188.20

It was shown in this connection that appellant entered into the brick business in Rusk, and he and Sanders and some others owned a plant there and manufactured brick.  Appellant is shown in one place to have claimed that the brick concern owed him $2,200.  According to another statement, the brick concern owed him $5,700.  According to his sworn statement the brick concern, which became insolvent, owed him $3,871.06.  All of this was borrowed money.  Appellant accounts for this loan by stating that his private money must have gone into it.

The statement of accounts between the Center Bank and appellant, including all of his accounts, left him due at said bank $363.

The account at the Gatesville bank, whose balance, so far as appellant's account as financial agent of the penitentiary shows, was settled, leaving nothing due him in said bank; and the account at the Rusk bank showed Busby was due same some $370 at the time of Busby turning over the office in March, 1903.  According to his own account he

was then due the State $1,470.30, which he appears to have paid. With reference to the above statement, it is shown Busby should have placed of his own private funds in the various banks, in conjunction with the State's funds, the sum of $11,188.20. However, it is shown that the $688.20 was borrowed on a note from the Gatesville bank, and was paid. The $1,100 shown to have been received from Guyton, appellant also says he paid. It is nowhere shown that he is still due the San Augustine bank $1,800 and this was paid. The $2,200 borrowed from the Center bank was paid. These items would amount to $5,788.20, which, deducted from the $11,188.20, would leave the amount of $5,400, as all the money of appellant's individual funds which went into the bank. In addition to this appellant says that he received a salary of $1,500 a year for four years, that he lived economically, etc., and he estimates that he must have paid a considerable portion of that into the general fund. If we estimate this as much as $1,000 a year, that would be $4,000 more, which would show of his individual fund $9,400 as paid by him into the banks and mingled with the State's money. Now, if we take the figures of the State's experts showing a shortage of $26,000 on the whole account, and allow appellant everything that he could possibly claim, he would still be a defaulter; if he is allowed the $11,188.20, the $4,000 of his salary added, this would be $15,188.20, and he would still owe the State $11,000. If he is only entitled to the $5,400 as actual money put into the common fund, he would owe the State $20,600, or if he is allowed in addition to the $5,400 the $4,000 on account of his salary, which would make $9,400, he would still owe the State $17,000. So on this count there is no question that he is a defaulter to the State. On the other count, of course, if the judgment, based on the auditor's report against W. M. C. Hill and appellant, is a criterion, he was defaulter in the sum of some $6,000, which by agreement or compromise was placed at $4,200. If we estimate his shortage, based on certain items shown to have been collected by him, some thirty or forty in number, he was short some $6,000. It may be also observed in this connection that a charge was made against the State of $200, which Busby charged for making his bond. This appears as a charge for "extra services rendered." In connection with his individual property, it may also be observed that he concedes that he lost $280 in a land speculation.

Appellant's first contention is that a motion in arrest of judgment should have been sustained, because the indictment is repugnant in that it charges appellant was an officer of the government and that he was a clerk and employee of such officer. The proof in this connection shows that appellant was called the assistant financial agent, and that as such he was subordinate to W. M. C. Hill, his superior. In effect, he was but a clerk and employee at the penitentiary and was responsible to W. M. C. Hill. We take it that the terms here used are not necessarily repugnant to each other. He might be an officer of the govern-

ment and a clerk and employee also of the government. A clerk may be an officer of the government. Besides this, there was no motion to quash; the motion was made after the verdict and came too late, unless there was an absolute repugnance in the indictment. See Pisano v. State, 34 Texas Crim. Rep., 63; Nicholas v. State, 23 Texas Crim. App., 317, and Rumage v. State, 55 S. W. Rep., 64.

Appellant contends that the court committed an error in permitting the State to introduce the checks which were turned over to the bank and by it collected, his claim being that if anything was embezzled by him it was the checks and not the money. We do not regard this as tenable. The parties on whom these checks were drawn were indebted to the penitentiary for goods bought by them of Busby as agent of the penitentiary. The parties owed money for the goods, and their indebtedness was not settled until collected in money. When the money came into the bank through these checks drawn by Busby on the parties and collected by the bank, it was the money of the State, and the appropriation by him afterwards was an appropriation of the money of the State. Leach v. State, 10 Texas Ct. Rep., 850; State v. Griswold, 46 Atlantic, 829; Per McKinney, 10 Mich., 53. Appellant contends the court erred in permitting the Lee Lloyd item to be proven. This was a small item of $20, of date February 19, 1902, it was shown that he gave Busby his check for this amount on the First National Bank of Rusk, Texas. Witness says he did not know what became of the check after that time. It seems that the goods were receipted for and marked paid at the time the check was given, and the witness had money in the bank. It seems to us that Busby was chargeable with this amount, and the evidence introduced was legitimate to show a prima facie case on account of said check against him. If this check was lost and was never collected, the proof should have come from him. Also an objection was made to the introduction of an item of $7. W. R. Mitchell of Troupe, Texas, purchased a door-sill from the penitentiary in 1902, and on November 28, the witness sent a postoffice money order in payment of the sill to W. M. C. Hill, Financial Agent, Rusk, Texas. The witness was a postmaster at Troupe, Texas; did not know whether the order had been paid; never had been returned to him. If it had not been taken from the postoffice at Rusk he would have been so notified. There was nothing in this objection. Also there was an objection to a small order of $5.40. R. Y. Lacey of Pittsburg bought furniture of the Rusk penitentiary in 1903; he remitted by postoffice money order from Pittsburg, dated February 17, 1903. It was mailed to the defendant at Rusk and was never returned, nor was any notification ever given that it was not paid. This testimony was admissible on the same ground on which the court permitted the testimony of the witness Mitchell.

Appellant also further complains that the State was permitted, over his objection, to introduce two checks purporting to be checks of the Simmons Hardware Company of St. Louis, Mo., on the National

Bank of Commerce of St. Louis, payable to the order of W. M. C. Hill. Each of these checks, when offered in evidence, was endorsed on the back "pay to J. S. Wightman, Cashier, W. M. C. Hill, by A. S. Busby, A. F. A." The amount of these checks was placed to the credit of Busby's account with the Rusk bank. The objection urged against these is that there is nothing tending to show that they were checks belonging to the State of Texas. We think there is enough in connection with the checks to show this. The fact that they were made payable to W. M. C. Hill by A. S. Busby, and endorsed by him officially, would suggest that they were funds of the State.

Appellant says the court committed an error in refusing to permit the witness King to testify that he bought merchandise from the penitentiary while Busby was assistant financial agent amounting to twenty odd dollars, which he paid at the prison of Rusk in the absence of Busby to a convict bookkeeper. There is no evidence that Busby was charged with these goods on this account. The court did not err in rejecting the testimony.

Appellant excepted to the item introduced in evidence with reference to the money collected from the I. & G. N. Railroad. The proof in this connection shows that the amount collected by Busby and reported to Hill was $854.76 less than he actually collected. Objection urged to this testimony was that it was barred by the statute of limitation, and this appears to be the case, and will be discussed later on when the charge of the court on this subject is reviewed.

Objection was made by appellant to the entries in the book upon the ground that the books were not kept by Mr. Busby and that he never made any entries upon them, and also it was testified to by Mr. Lubbock that in the discharge of his duties, it was important for him to have books kept correctly, and that the man who kept the books was not appointed and did not hold his position under him; he was not of Busby's employment or selection but was furnished by some other official and, therefore, Busby is not responsible for the condition of the books. In this connection Walker, being called, testified that when he took charge of the office and settled with Busby, the settlement was based on the books in Busby's office and he identified the book in question, the ledger, as one of the books turned over to him by Busby. We think the books were properly admitted. It was not necessary for Busby to appoint the bookkeeper; he was under his supervision and control. Busby made all his reports based on these books. The books were made up from the material furnished by Busby, and whether the bookkeeper was furnished by him or not, under the circumstances they were properly admitted. We notice in the record while Busby testifies, in a general way, the bookkeeper was not of his selection, yet it seems that he had control over the bookkeeper. On page 242 of the record we find that his bookkeeper Green got drunk one night, and he was put back on the inside, and not permitted to be a trusty, and he got mad at appellant because he would not take him out. Appellant says he

kept trying to get a suitable man and had to take him out again, but did not keep him very long. It seems that this same man Green, or some other one in the office closely connected with appellant, furnished him with the fragments of a letter written by Walker directly after he took charge of the penitentiary, which first notified appellant that he was detected in a shortage of his accounts.

More than this, it appears that while the bookkeepers may not have been of appellant's selection, they were under his control. Lubbock, who was keeping the books when appellant first took charge at the penitentiary, shows that he made up the books solely under the direction of appellant, and even withheld the entries that should have gone on the books at his instance, to wit: there were some 800 registered orders which were for goods sold locally at the penitentiary,· that were in the office, but were withheld from the books. Peo. v. Leonard, 106 Cal., 302, 39 Pac., 617; 2 Enc. of Evidence, p. 666.

Appellant also objected to the judgment rendered against Hill and himself as sureties. As we understand the rule, this was a valid and binding judgment against appellant. He was a party and privy thereto; was present at the time of its rendition, and evidently agreed to same. It may not have been absolutely binding on him as a stated defalcation in this criminal trial, but it was certainly prima facie evidence against him of defalcation or indebtedness to the penitentiary. See 2 Elliott on Evidence, sec. 1527. State v. Intoxicating Liquors, 47 Atlantic Rep., 779 (Vt.); Coffey v. U. S., 116 U. S., 436, 29 L. Ed., 684.

Appellant also objected to the report of the two expert bookkeepers, who were appointed to examine the books and make a report between appellant and the penitentiary, and to state the result. This objection related to the testimony particularly of Briggance. This character of evidence seems to be admissible under the authorities. See Findley v. State, 14 S. W. Rep., 185; Masonic Lodge v. Lackland, 10 S. W. Rep., 895, and Hollingsworth v. State, 111 Ind., 289.

We understand appellant to have made some objection to the refusal of the court to permit the witness Martin to state that he investigated the account of Mr. Busby with the brick company, and that his investigation showed that Busby had never made a claim against the brick company for the $1,000. We do not understand the witness here proposes to speak even from the books, and the books were not introduced. It does not occur to us this would be legitimate testimony to meet the testimony of the Rusk bank and Wightman to the effect that that $1,000, by direction of appellant, went to the credit of the brick company, and that there was no effort made by appellant to have any correction made until a year or so after, about the time he was vacating his office, and then he said he wanted it placed to his credit on account of the penitentiary instead of to the credit of the brick company, which was then a bankrupt institution.

Appellant claims that the court committed an error against him in

charging the jury in substance: "This is in part a case of circumstantial evidence, and you are charged that in order to warrant a conviction of a crime wholly on circumstantial evidence," etc. Then follows, a correct charge on circumstantial evidence. If this was a case depending wholly on circumstantial evidence, then the court would have been bound to instruct the jury on circumstantial evidence. However, as stated by the court, it was not a case wholly depending on circumstantial evidence and, therefore, the court was not bound to give a charge on circumstantial evidence at all, and the charge given was not calculated to injure appellant.

Appellant complains of the introduction of certain testimony relating to items, which he claims, were barred by statute of limitation, that is, items of moneys received by appellant prior to the 17th of June, 1901, and the charge of the court with reference to the moneys shown to have been received by appellant prior to said date. We notice that appellant says in his evidence that he was not required to keep the money at any particular bank which he received on behalf of the State, or to pay it over at any particular time. If that be true he could retain same until called on to account; not being called on to account prior to the 17th of June, 1901, and in fact not being called on to account until he turned over his office in March, 1903, none of the items would appear to be barred. However, the court seems to treat all of the items of moneys received by appellant prior to the 17th of June, 1901, as barred by the statute of limitation, for the court gave to the jury the following instructions: "If you find from the evidence that defendant fraudulently misapplied or converted to his own use public money at any time not within three years prior to the presentment of the indictment in this case, to wit: June 17, 1904, you are instructed that you cannot convict for such misapplication or conversion, if any such there was. In connection herewith you are further instructed as follows: with reference to an item which has been called the Judge Gibson item, and an item of $268.25 which it was claimed was paid by the Agent of the Cotton Belt Railroad at Rusk to the defendant, and an item of $270.54 which the State claims was the difference between the amount paid to the defendant by the I. & G. N. R. R., and the amount reported by the defendant to W. M. C. Hill, and an item of $221.18 which is claimed by the State to be the difference between the amount reported by the defendant to W. M. C. Hill, and any other items which you may find from the evidence may have been paid to the defendant prior to June 17, 1901, you cannot consider or take as the basis of the charge upon which to found a conviction; and the defendant cannot be convicted upon any of the said charges. While evidence to said items has been admitted to be considered by you in connection with other evidence in the case, as bearing on intent of defendant and as bearing on the State of the account between the State and defendant, still you are charged that none of said items or matters can be taken as the basis upon which to found

a conviction." This charge is objected to not because it informed the jury that he could not be convicted for funds received prior to 17th of June, 1901, but because it is insisted that the court gave an improper instruction with reference as to how the jury should consider said prior items, that is, they were told that they could look to said items as bearing on the intent of the defendant and as bearing on the accounts between the State and defendant, that is, as we understand the proposition, if appellant was managing the affairs of the penitentiary improperly and misappropriated its moneys prior to the 17th of June, 1901, that would constitute legitimate evidence as bearing on appellant's after conduct with reference to such matters. It occurs to us that this was a legitimate purpose and might be considered by the jury as bearing on the question of intent.

In regard to the suggestion that the jury might consider same with reference to the state of accounts between the State and the defendant, they could only use such testimony in favor of appellant, because if it appeared that the State was over-paid by appellant on the 17th of June, 1901, then such over-payment would be for the benefit of appellant in reviewing his account subsequent to said date. Of course, they could not look to these prior accounts, or any item thereof, in order to convict appellant, because they were expressly instructed not to do so.

Appellant contends that the court erred in enumerating four essential requisites in order to constitute the offense charged against appellant. He insists that said charge, taken in connection with the failure of the court to charge that the burden of proof was on the State, was erroneous. We believe that the court was correct in its enumeration of the four essential things necessary to constitute appellant's guilt of the offense charged, and in this connection it was proper to tell the jury if either of said requisites were wanting, then the prosecution failed and defendant would be entitled to an acquittal. Said charge properly placed the burden on the State to show said requisites before the jury would be authorized to convict, and then told the jury that if they believed appellant received said sum of money as charged in the indictment, or any part thereof, and that he unlawfully and fraudulently misapplied and converted same to his own use, then you will find him guilty. It is also assigned as error that the court, in this connection, told the jury that if after the conversion appellant accounted for or made good to the State said money, that such payment would be no excuse, extenuation or justification of said offense. We presume this charge referred to the payment by Hill and appellant's bondsmen of $4,200. Of course, if appellant had fraudulently converted said sum before he was compelled to repay it, the payment thereof would not exonerate him from criminal prosecution. Goodwyn v. State, 3 Texas Ct. Rep., 28; State v. Noland, 111 Mo., 473; Fleuner v. State, 58 Ark., 98.

It is also complained that the court placed the burden of proof on

appellant of accounting to the State for the money alleged to have been embezzled in the following charge: "On the other hand, you are charged that if you should find from the evidence that on a true accounting between the defendant and the State of Texas, or at the close of his administration of the office of Assistant Financial Agent the defendant paid over to the State all that he was justly and rightfully indebted to the State, then the defendant would not be guilty, or if upon a true accounting between the defendant and the State, the defendant is not shown to be indebted to the State, or that there was in fact no shortage in his accounts, or if the alleged shortage in his account has been satisfactorily accounted for, and has been in fact shown not to have existed, and if it has been shown that in fact that he accounted to the State for all the funds that came into his hands and that there was no shortage in his accounts, then the defendant would not be guilty, and you should acquit him." This is evidently the statement of the law. We hold the rule to be that where a public officer is shown to have received money on account of his trust, it is incumbent on him to pay it over to the State in accordance with the obligation assumed by him. In Evans v. State, 40 Texas Crim. Rep., 54, 48 S. W. Rep., 194, it was held that where a party receives money or property to be disposed of in a particular manner, and further shown that same was not so disposed of, it was then incumbent on such party to show that it was disposed of in some other manner not criminal; that where exculpatory evidence of an important character is peculiarly within the knowledge of defendant, it is his duty to produce it. See Jackson v. State, 6 Court Reporter, 153.

Now, as we understand this record, the evidence showed in three distinct ways that appellant was a defaulter to the State. In one particular instance, particular items are shown, 35 or 40 in number, which appellant received, and these amounts aggregate some $6,000, and his books do not show that he paid this to the State, nor is it otherwise shown. Again, it is shown that he was party to a judgment in which he was adjudged in default, the sum of $4,200. The auditor in that suit showed that he was in default of the sum of $6,000, but the case was compromised on the above amount, and judgment rendered therefor. Again, the State showed by expert accountants that his deficit was some $26,000. Appellant answers this, or attempts to answer it by showing that he kept his accounts at three different banks, one at Rusk, one at Gatesville, and one at Center, and all of these accounts were official accounts, but he claims there went into these his private funds. He was given full opportunity to show his resources and where he may have acquired any private funds to go into said banks, and as has been stated, if he is given full benefit of any real tangible moneys, these amounted in the aggregate to the money derived from his home, $1,000; from his drug business $1,100, and from his pig-iron speculation $800. These amount to $2,900. Now, if we add to this his mere estimate that he ought to have gotten

$1,500 out of his drug accounts at Gatesville, and that he ought to have saved out of his salary $1,000 a year for four years, which would be $4,000; these altogether would amount to $8,400. As heretofore shown, however, appellant mixed his private funds with the State's funds, and it was his duty to eliminate these from the State's money, and the burden was on him to do so, as the evidence was peculiarly within his knowledge. We take it that all the money he satisfactorily accounts for is the $2,900, as above shown. Under the circumstances, it being within his power, and not incumbent on the State to show what private funds of appellant's were mingled with the State's, can it be said that the charge of the court above complained of, imposed an undue burden on appellant, even if it be considered that the charge placed a burden on him to eliminate his private funds from the State's funds. We think not. In the State v. Czizek, 38 Minn., 192, which is, in some respects, very much like the case involved, the court uses this language: "In view of the undisputed testimony as to the state of his accounts and his manner of doing business it was entirely immaterial whether the officers of the bank knew that a portion of the amount standing to his credit belonged to the city, or that he expected they would take care that the same was not applied on his individual indebtedness. The evidence on these and kindred questions was properly rejected. Defendant knew—or if he did not know the state of his accounts at the bank, it was culpable negligence on his part not to inform himself in respect to the matter, and no legal excuse was shown or offered to be shown on the trial for mingling the funds of the city with his own. He knew, or ought to have known, that these funds were being applied on his own account; and as the transactions with the bank extended over many months, and his deposit book was frequently balanced in the meantime, no shadow of excuse appears for the apparent gross negligence and carelessness which characterized his management of the trust committed to him." See also Sparhawk v. Sparhawk, 114 Mass., 356, and 28 Am. and Eng. Ency. Law, p. 1064. In Hemingway v. State, 68 Miss., 371, he pleaded, among other defenses, that the books of his office were kept by others; that he did not know of certain entries which tended to prove the State's case. He requested an instruction to the effect that, if the jury believed he had no knowledge of the entries in the books, they would not consider them against him. The charge was refused, and the supreme court, in discussing the assignment of error, says: "There was no error of the court in refusing this instruction. The defendant was state treasurer and as such was charged by law with the custody of the public money, and with the keeping of the official records showing his dealings with them. If he did not himself receive and disburse the moneys, and if he did not himself make the entries in the records of such receipts and disbursements, but employed another to perform his duties in these particulars, the action of that other must be held to be his action, and his criminal liability cannot thereby be evaded except by showing the

incorrectness of the books so kept by such other person. The law confided the great trust to the defendant, and for its execution, whether by himself or another, the defendant must make answer."

Appellant complains that the court refused to give his charge on mistake or inadvertence: Said charge reads as follows: "A fraudulent intent on the part of accused is an essential element in the offense of which the defendant is charged in this case; and this fraudulent intent must be established by the evidence to the satisfaction of the jury beyond a reasonable doubt before any conviction can be had. And although you should believe from the evidence that the defendant collected money belonging to the State and that he failed to report all the money he had collected, and although you should believe from the evidence that he did not account for or pay over to the State all the money which may have come into his possession belonging to the State, still you could not convict unless the evidence in the case showed that he knowingly and fraudulently misappropriated or used the same. The defendant would not be guilty of the failure to report the money collected by him if it was brought about either by mistake, oversight or inadvertence, either of himself or of any other person. Nor would the defendant be guilty if the failure to report the money or the failure to pay over or account for any money that came into his hands was brought about or caused by the act of the bookkeeper or any other person, or their oversight, mistake or inadvertence. And if you should believe from the evidence in the case that there was an arrangement which the defendant had with the cashier of the bank at Rusk by which the cashier was to notify the defendant when drafts or checks were collected, and if you should believe from the evidence that the defendant had adopted a method or system by which he was not to credit the accounts of parties on the books of the penitentiary until he had received a notification from the bank that the check or draft had been finally paid, and if you should further believe, or if you have a reasonable doubt, that any failure to report any money collected was brought about by a failure of the cashier of the bank to notify the defendant that the checks or drafts had been paid and that at the time the defendant reported to Hill he did not know that they had been paid and for that reason he did not report the same, and if you further find that the failure to report any sums that were collected may have been brought about by mistake or by oversight or inadvertence through an arrangement between the bank and the defendant as above explained, then the defendant would not be guilty of the failure to report moneys collected, such as would be considered as criminal act on his part." This charge evidently refers to a few items, some two or three in number, constituting the Dallas Water Works drafts and Hines Lumber Company draft, and perhaps some others about which there was some delay in collecting at the bank. According to the testimony these drafts on parties indebted to the penitentiary were not made a final charge against appellant until the bank reported to him the col-

lection. However, the evidence conclusively shows that every check introduced by the State was shown to have been ultimately collected by the bank, and was a proper charge against appellant. So far as we are advised, there is no question of mistake as to this matter, as to the collections made by the Rusk bank. If any collections were placed in that bank, or others, of appellant's private funds, which were not collected, and appellant or the bookkeeper made a mistake as to these, and appellant overdrew the account, the record does not even suggest such matter. Nor do we recall any mistake made, as far as the evidence is concerned, as to the books kept by appellant at the penitentiary or under his supervision; nor in the monthly reports made by him to Hill, taken from his book of accounts kept at the penitentiary. Besides this, appellant was guilty of gross negligence in mingling his individual money with the State's money, if he did so. If any mistake was made in this regard, it must be such that the person so acting under the mistake would have been exonerated had its conjecture as to the fact been correct, and it must also be such mistake as does not arise from a want of proper care on the part of the person committing the offense. See 1 Bishop's New Criminal Law, sec. 302 and sec. 313. We do not believe the court was called on to give appellant's requested charge on mistake. The court gave a sufficient charge, as we think, with reference to the fraudulent intent of appellant necessary to constitute this offense, and it properly placed the burden on the State to show this fraudulent intent, and it was not necessary to define fraudulent intent further than was done. Of course, in cases of this character, there must be a fraudulent intent on the part of appellant, but in addition to the mere fact of a failure to account for funds received and belonging to the State, but slight additional evidence is required. See Evans v. State, and Jackson v. State, supra. As was well said in Hemingway v. State, 68 Miss., 414: "It will thus appear that there is much confusion on this point in the reported English cases, but we are bound to hold that the rule declared in Rex v. Grove is the true rule. There can be no other rule in cases involving public officers holding for long terms, and having absolute control and custody of public funds, and whose reports of the state of their accounts are made from time to time. If the failure to pay over the balance shown by his own books, granting the books to be correctly kept, and granting nothing to the officer's conduct worthy of reprehension, as far as any official act discloses such conduct, will not warrant a jury in inferring a conversion of any sum found to be short, then the indictment and prosecution of any state treasurer, or other officer of like character, will not only be a vain and empty form, but it will, moreover, a shameful and demoralizing play of judicial legerdemain by which even the notoriously guilty shall surely escape just punishment. If the doctrine that a failure to pay over, as required by legal obligation, standing unexplained and unrelieved, will not warrant conviction, then the unfaithful public officer may safely convert the public moneys to his personal use,

and either boldly refuse, or blandly fail to settle and pay over the unexplained balance, and securely defy a plundered people by simply wearing an unruffled countenance, and maintaining a placid demeanor, and keeping correct books, and not publishing to the world that he is steadily emptying the State's treasury vaults. Surely, it cannot be thoroughly believed or successfully maintained that such a transparent travesty of judicial proceeding would not transform the courts of the country into mere theaters for idle mummeries. And yet this is exactly the situation in which we shall finally find ourselves if it is true that no criminal responsibility attaches to a simple failure to faithfully account for and pay over public moneys by the State's officers, without reasonable explanation, according to their legal obligation."

"In the very nature of things, the fiscal agents of the State, who are employed in the receipt and disbursement of public money through long terms of office, can rarely, or never, be convicted of embezzlement, even where they fail or refuse to pay over, though there be an unexplained shortage in the final accounting, except by the evidence of that shortage itself and failure to pay over, and so the plainest requirement of necessity, will drive us, in the administration of the law punishing the crime of embezzlement, to hold that the balance shown to be due by the officer's own books and failure to pay over, unexplained, must alone warrant a conviction. The rule is not only a necessary one; it is eminently reasonable and just, as well."

Here we have, at the very outset of appellant's career at the penitentiary, as alleged, his using three banks as depositories for the State's money without any reason on behalf of the State assigned, but purely for the benefit of appellant and his friends; and we have all these accounts kept in the name of appellant as Assistant Financial Agent of the penitentiary, and we find him shifting the moneys of the State from one bank to the other; and we find him, according to his statement, placing his individual moneys in said banks and depositing same as State money. This is negligence so gross as to be criminal, to say the least of it.

Shortly after his taking charge of the penitentiary as Assistant Fnancial Agent, he assisted in organizing a bank at Center in Shelby County, Texas, with one of his friends, who formerly lived at Gatesville, appellant's home town. He also organized a brick manufactory at Rusk, and kept these accounts indiscriminately with his State accounts. That concern proved insolvent and, as shown by him, it is due him now about $5,800, and he states that his individual money derived from his own resources must have gone into this bankrupt concern. In addition to this we find him suppressing the entry of sales in the penitentiary books through the bookkeeper Lubbock, these appearing to have been local sales and not sales abroad. Whether these were ever entered or not is not known, or what was done after Lubbock left the penitentiary with local sales, and the funds derived therefrom, we are not informed. In addition to this, we find him failing to re-

port a number of items, according to the statement, some $6,000 worth, which he collected of the State's money, and, moreover, in his reports of certain collections to Hill, in a number of instances, he reported less to him than he had collected. In one instance he charged the penitentiary for procuring security, which he gave to Hill, the Financial Agent, which cost him $200, and he charged this as "extra expenses." After he turned over his office to Wortham, his successor, according to the testimony of the latter, he admitted he was short and promised to make it good. Instead of this, he fled the State and changed his name. In the face of all these circumstances and others with which this record is replete, it does not occur to us that the court was further required to define fraudulent intent, or to instruct the jury with regard to a mistake of fact; nor can it be said that the evidence is not sufficient to justify the verdict. In our opinion it is ample.

There being no reversible errors in the record the judgment is affirmed.

*Affirmed.*

Davidson, Presiding Judge, dissents.

### ON MOTION FOR REHEARING.

#### May 15, 1907.

HENDERSON, JUDGE.—At a former term the judgment in this case was affirmed, and now comes before us on motion for rehearing. In passing on the motion we will only review such questions as we think are material and necessary to be considered. In the original opinion we held that the judgment against appellant in a civil suit was admissible in evidence against him on the part of the State in a criminal case. Said judgment was rendered in a civil suit, in which the State of Texas was plaintiff, and W. M. C. Hill, the financial agent of Texas penitentiaries, and his bondsmen were defendants. In that suit the defalcation of this appellant was the material question, and the defendant Hill and others made appellant a party defendant. The litigation directly involved this appellant's management of the Rusk penitentiary, and his deficit to the State during the four years of his management as Hill's subordinate. At the instances of the parties to that litigation an auditor was appointed, and he ascertained and reported to the court a deficit of some $6,000. The suit was compromised, and a judgment by consent rendered for the sum of $4,200, about one-half of which was paid by Hill, and the other half of which was paid by a bond company who were securities on this appellant's bond. The State offered that judgment in evidence against appellant in this case. This was objected to on the ground that a judgment in a civil case was not admissible in evidence against this appellant. As stated, appellant was a party to the civil suit, and the State was a party to that suit, and the same subject-matter, to wit: appellant's defalcation or indebtedness to the penitentiary was involved in both suits, and we,

therefore, held that the judgment was admissible. In his original presentation of the case appellant furnished no authorities, but he now cites a number to sustain his position, and he also criticises the authorities cited by the court, to wit: State v. Intoxicating Liquors, 47 Atlantic Rep., 779, and Coffey v. U. S., 116 U. S. Rep., 436. The cases cited by appellant are as follows: Britton v. State, 77 Ala., 202; Riker v. Hooper, 35 Vt., 457; State v. Bradnack, 69 Conn., 212; People v. Leland, 73 Hun, 162; Dunagain v. State, 38 Texas Crim. Rep., 614; People v. Kenyon, 93 Mich., 19; People v. Beevers, 99 Cal., 286; 2 Black on Judgments, sec. 599; U. S. v. Jaedicke, 73 Fed. Rep., 103, and Stone v. U. S., 64 Fed. Rep., 671. We have carefully reviewed the authorities heretofore cited by this court as well as those furnished by appellant. The State v. Intoxicating Liquors, supra, was a proceeding in rem, and the effect of the holding there was to make the record of same party's acquittal on a charge of keeping with unlawful intent intoxicating liquors evidence in his favor in a civil proceeding in rem, and a complete bar to a prosecution. It is said, "that this proceeding is civil, and not criminal, in its nature, and that a judgment in a criminal case cannot be used in a civil action as proof of the facts determined. Undoubtedly the rules governing the admissibility of judgments will ordinarily prevent this use, but the mere fact that one proceeding is civil, and the other criminal, does not render the doctrine of res judicata inapplicable." Coffey v. U. S. is referred to in that decision, and is authority to the effect that the judgment in a libel suit against Coffey, which was in the nature of a proceeding in rem, was conclusive in his favor in a subsequent criminal prosecution involving the same question. This latter case was reviewed in Stone v. U. S., 167 U. S., 186, and it was there said: "That the rule established in the Coffey case can have no application in a civil case not involving any question of criminal intent or of forfeiture for prohibited acts, but turning wholly upon an issue as to the ownership of property. In the criminal case the government sought to punish a criminal offense, while in the civil case it only seeks in its capacity as owner of property, illegally converted, to recover its value. In the criminal case his acquittal may have been due to the fact that the government failed to show, beyond a reasonable doubt, the existence of same fact essential to establish the offense charged, while the same evidence in a civil action brought to recover the value of the property illegally converted might have been sufficient to entitle the government to a verdict. Not only was a greater degree of proof requisite to support the indictment than is sufficient to sustain a civil action, but an essential fact had to be proved in the criminal case, which was not necessary to be proved in the present suit. In order to convict the defendant upon the indictment for unlawfully, wilfully and feloniously cutting and removing timber from lands of the United States, it was necessary to prove a criminal intent on his part, or at least that he knew the timber to be the property of the United States.   *   *   *

But the present action for the conversion of the timber would be supported by proof that it was in fact the property of the United States, whether the defendant knew that fact or not." And it was held that the United States, in the criminal case there presented that the defendant had not been guilty of a crime, neither forfeited its rights of property in the timber nor its right in the civil action, upon a preponderance of proof, to recover the value of such property. We are constrained to concede that neither of the authorities formerly referred to by us are exactly in point, and when analyzed they do not support the view taken by the court. We have also been referred to the cases of Dorrell v. State, 83 Ind., 357; Commonwealth v. Ham, 31 N. E., 639, and State v. Meek et al. (Iowa), 84, N. W., 3, as tending to support the position heretofore assumed by the court on this proposition. The Dorrell case is simply authority for holding that a former adjudication in a civil action establishing a boundary between two parties, that the judgment in said case was admissible against the defendant in a subsequent prosecution for trespassing across the boundary line which had previously been established. It was held in that case that the establishment of a boundary line in a former proceeding excluded any inquiry into antecedent facts to the contrary. In Meeks case it was held that a judgment of not guilty entered before a justice of the peace under an act declaring the maintenance of any dam without a fishway to be a nuisance subject to abatement, was a bar to a subsequent suit in equity to abate the nuisance (the justice having jurisidiction, and· there being no change in the conditions), since the abatement of the nuisance would have been a part of the penalty imposed had there been a conviction before the justice. It may be said that neither of these cases are in point, though some of the cases referred to tend to show that under certain circumstances judgments in civil cases are admissible in criminal prosecutions between the same parties; and to the same effect see Dent v. State, 43 Texas Crim. Rep., 126; Burt v. Union Central Life Insurance Co., 187 U. S., 362, Lawyers' Edition, 216. In the latter case the court held in effect that the judgment of a State court convicting appellant of murder in the first degree, under which he was executed, was final in a civil action to recover on a life policy of the deceased in favor of the beneficiaries therein as against his plea of insanity offered in a civil case, discriminating that case from the Mutual Life Insurance Company v. Armstrong, 117 U. S., 591. However, the question of the introduction of a judgment in civil cases between the same parties ·in a criminal case, has been before the courts in several cases, and the general doctrine announced that such records are not admissible in evidence. In Queen v. Moreau, 11 A. & E. (N. S.), 1028, English Common Law, this question came before Lord Denman. In that case F was indicted for perjury committed by deposing, in an affidavit in a cause wherein he, F, was plaintiff, and E defendant, that E owed him 50 pounds, and it was held, in support of this indictment, evidence was not admissible

that the cause of F against E was, after the making of the affidavit, referred by consent, and an award made that E owed nothing to F. After some colloquium, in which the authorities are cited, the chief justice said, "This was an indictment for perjury in an affidavit to found an application for a capias, alleging that the defendant in that suit, the prosecutor of this indictment, was indebted to him in the sum of 50 pounds. In order to prove the falsehood of that allegation, an award was put in evidence at the trial. After the indictment was found, the cause between the parties came on at the assizes and was then referred to the arbitration of a barrister, who decided in favor of the defendant, that he owed nothing to the plaintiff. His award is the document objected to, but admitted. On a motion for a new trial on this ground, we are of opinion that it was improperly received; not because the untruth of the statement was not necessarily inconsistent with the defendant's believing it to be true; for his knowledge of its falsehood would require it to be proved by other evidence; but because the decision of the arbitrator in respect to that fact is no more than a declaration of his opinion, and there is no instance of such a declaration of opinion being received as evidence of a fact against the party to be affected by the proof of it in any criminal case." Other authorities put the doctrine on other grounds as that the rule of evidence in civil and criminal cases is different, the one authorizing a judgment on a preponderance of evidence while the other requires the proof to be beyond a reasonable doubt, etc. Still, others place the doctrine on the ground of a want of mutuality, the parties not being the same in criminal and civil cases, and some upon the idea that in a civil case the parties need not be confronted by the witnesses, but depositions can be taken, while in a criminal case the parties must be confronted by the witnesses against them. Britton's case, supra, cited by appellant, is very much in point. There a civil judgment was recovered against a defaulting tax collector and his sureties, and it was held by the Supreme Court of Alabama that it was reversible error in the court below to have admitted the judgment in evidence against the same party in a criminal prosecution, the judgment establishing the amount of his defalcation. In passing on this question the court used this language: "The judgment recovered against the defendant and his sureties, in the civil suit instituted against them by the County of Hale, for liabilities incurred in his tax transactions, was not properly admissible in evidence to establish any fact on which it was rendered. In civil actions juries are authorized to decide on the mere preponderance of the evidence, when it produces satisfactory conviction. In criminal prosecutions, they are not authorized to convict, unless they are satisfied of the party's guilt beyond any reasonable doubt. The judgment in the civil cause, moreover, may have been rendered on a state of facts totally irrelevant in a criminal prosecution for embezzlement, as, for example, for a liability incurred by reason of the defalcation of the collector's deputies, or even his own negligent loss of

the tax money, for which he would be civilly but not criminally liable.     Another reason still is the want of mutuality, the parties to the two proceedings being different, the judgment having been recovered in the name of the county, and the prosecution being in the name of the State.     It would be hard for a defendant, as observed by Mr. Starkie, 'that upon a criminal charge, which concerns his liberty, or even his life, he should be bound by any default of his in defending his property.' "     To the same effect are several of the authorities cited by appellant.     In accordance with these we are constrained to hold that the view heretofore taken was erroneous, and that the court below should not have admitted the judgment rendered in the civil case against appellant, notwithstanding the State was a party plaintiff in the civil suit, and appellant was one of the defendants; thus far, there was mutuality but not complete mutuality, as there were other defendants, and although the subject-matter of the suit was the same, as we have seen, the rule of evidence was different in the two proceedings; said judgment may have been and doubtless was rendered upon a character of proof not permissible in this criminal prosecution.     Furthermore, if we should hold that there was complete mutuality in both civil and criminal actions, it would necessarily follow, if the State had been defeated in the civil action, and the judgment rendered in favor of this appellant, same would be a complete bar to any criminal prosecution, which is not the law.     The question then presents itself, said judgment having been admitted erroneously, can we say that it was not calculated to injuriously affect appellant.     As shown in the original opinion, the State presented three characters of proof, one the judgment, another consisting of distinct items of defalcation, amounting to about $6,000, and the other being the report of the auditors who examined the books and testified that appellant was in default, according to their showing, in the sum of about $9,000.     In the midst of this contrariety of evidence, what figure would the judgment cut?     If it was conclusive, as they were authorized by the court to regard it, it cut off all further inquiry as to his defalcation.     If it was prima facie evidence only it cast the burden on appellant to show that the judgment was erroneous.     Evidently the court put the judgment before the jury as conclusive evidence of his defalcation, as he instructed them in effect if the evidence showed that appellant was in default and that same had been subsequently paid or settled by appellant or others, it would be no defense.     This charge must have referred to the settlement of this judgment debt, which the evidence shows was paid.     Aside from this, we are aware with what sanctity the solemn judgments of courts are regarded, and unquestionably in case the jury entertained any doubt upon other lines of the State's case, as to appellant's defalcation, this doubt must have been entirely removed by reference to the judgment.     Under the circumstances, we believe it was bound to have a very decided effect with the jury upon one essential feature of the State's case; that is, appellant's defalcation and the amount thereof.

As the case must be reversed on this account, if for no other, we will merely refer to some other matters assigned in appellant's motion for rehearing for the guidance of the court below in another trial of the case.

Appellant questions the opinion of the court in holding that the lower court was not required to charge more fully than was done on the question of fraudulent intent and mistake, and that this failure to so charge was justified by appellant's negligence in dealing with the State's funds and in mixing his own private funds therewith. We did not intend to say that because of appellant's negligence the court would be authorized to say that this was tantamount to fraud on his part, but rather, in our opinion, the court was not required to give appellant's charges on this subject inasmuch as the court instructed the jury in regard thereto, and in connection with the other proof it occurred to us that the court might not be required to further charge on the subject of mistake and fraud than was done. However, on another trial we suggest if the proof should be the same that the court instruct the jury pertinently and directly as to his defense of mistake superinduced by his method of dealing with the bank. If appellant was misled by the failure of the bank to report to him certain collections in making his reports to Hill of the amounts collected, he should have had the benefit of this in a special charge. While appellant's negligence might be suggestive of fraud, it was not intended to decide that this was plenary proof of fraud. It may be that the court's charge on this subject was not full enough, and we may have been mistaken in the original opinion in holding that appellant's special requested charges on the subject were not required. However, this can be remedied in another trial. If the proof should not be satisfactory when the case is again tried that the books offered in evidence were kept by appellant, or under his direct supervision and control, then they should be excluded, unless other proof is offered that said books were properly kept; and that they were books of original entries.

Of course, we take it on another trial the court will rectify his charge on circumstantial evidence, should a charge on that subject be deemed necessary.

On another trial the court should be careful to eliminate all items barred by the statutes of limitation. Any items that are introduced in evidence that are questioned on the ground of limitation, the jury should be simply instructed to disregard all such items that they find to be so barred in considering their verdict.

The rehearing is granted, and the judgment is reversed and the cause remanded.

*Reversed and remanded.*

Brooks, Judge, dissents.

DAVIDSON, Presiding Judge.—When the original opinion was handed down affirming the judgment in this case, I dissented, intending

to write out my reasons for the dissent. Upon the motion for rehearing, after a more careful and critical examination of the questions involved, Brother Henderson reached practically the same conclusions that I entertained in regard to the disposition of the case, and embodied them in his opinion on motion for rehearing. I now concur with that opinion in reversing the judgment and remanding it for another trial. Believing that it would serve no useful purpose in writing out a concurring opinion, or in expressing any views of my own in regard to the questions discussed, I simply state this much to explain my position, as the case is now presented. Believing the judgment is correctly reversed and remanded, I concur.

BROOKS, Judge (dissenting).—I agreed to the affirmance of this case at a previous date of this court. There has been no legal reason suggested in motion for rehearing why the affirmance of the case is not correct. I did not agree to the proposition laid down in the original opinion that a contested civil judgment is conclusive evidence in a subsequent criminal prosecution for a defalcation, but the authorities cited in appellant's brief, which are collated in the opinion on motion for rehearing, are all authorities where a contested judgment was introduced in a subsequent criminal prosecution. But in this case we have an agreed judgment. The evidence in the record shows that appellant was present during the time that the evidence was being taken before the auditor, and knew that the judgment was entered, or at least it shows that he was present, and refused to go on the stand, and the trial court asked him this question: "Q. Did you refuse to take the stand and testify? A. I did not take the stand." In other portions of appellant's testimony he tries to excuse his failure to go on the stand on the ground that the civil suit, as he terms it, was predicated upon segregated items. In that case the State was trying to recover from appellant, the sureties on his bond, and from W. M. C. Hill, his principal, the amount of his defalcation and shortage. Appellant refused to get on the stand or explain a single item, or show wherein a single item was wrong, and his explanation, as stated for it, is because they were suing upon segregated items—a most absurd reason. The prosecution asked appellant this question: "Don't you know that you would not take the stand as a witness because Judge Reese, who was attending to the suit, on behalf of the State, had a stenographer there to take your evidence down in writing? A. I did not see any. Q. You were informed of the fact that if you testified to these facts that a stenographer would be there to take your evidence for the State? A. I naturally supposed it would be taken down. Q. Did Mr. Hill, or his lawyer, Judge Smith, who used to be district judge, or W. A. Hudson, or Mr. Hill himself, ask you to take the stand and testify as to whether or not that was your private money; or any facts that would save them or keep them from having to pay the money? A. It is my impression that they left it entirely with me and did not insist on it; and they stated

they did not blame me for not doing it.   Q.   If it was the truth it did not hurt for a stenographer to take it?   A.   It is being taken down now."

I have quoted this excerpt from the evidence to show in part, and the record is full of other testimony showing that appellant was an active participant both in the taking of testimony and assisting the auditor, upon whose findings an agreed judgment was subsequently made and, therefore, he is bound by his agreement, and it can be proved upon him in a subsequent prosecution.   If he had stated to any one at the court that he owed the State $4,200, this admission could have been proven.   Then if he concedes and enters up an agreed judgment for the sum of $4,200, why can't this equally be proven?   Certainly it can.   As I stated above, the authorities cited by the court in the opinion overruling the original opinion and granting appellant a new trial, relate to contested judgments.   But certainly where appellant is present, and an active participant in accounting between himself and the State, with his lawyers and legal advisers all present, agrees with the State to enter a judgment of $4,200, then it is frittering with justice to say that the introduction of said agreed judgment could form a basis for the reversal of the case.   The record before us shows a most shameless prostitution and betrayal of a high trust on the part of appellant, and a defalcation so infamous in its proportions and so outrageous in its details as to startle the mind when it is insisted the introduction of an agreed judgment could have done him any injury in this case, even conceding it was not admissible.   The record shows thousands of dollars of defalcation over and above the $4,200.   It is very troublesome from the record to ascertain the amount because of the infamous rascality manifested by appellant in mixing his own private funds with the State's funds, in covering it up, and putting it in banks all over the State of Texas.   The evidence clearly would warrant a judgment against appellant for at least $20,000.   He admitted in the agreed judgment that he was defaulter in the sum of $4,200.   That was a compromise.   The auditor's report showed he owed $6,000.   He said this report was made up from "segregated items."   As stated above, the conclusion from this record would be irresistible that an auditor's report would show at least a defalcation of $20,000.   However, if this appellant has not been tried according to law, he should have a new trial, but I solemnly protest against the statement that he has not had a fair trial under the law of this State, and assert the proposition laid down in the original opinion that he has had such a trial; that the record is replete with defalcations, and the State's case is manifoldly made out, and there is no error in the record requiring a reversal of the case.   I therefore dissent from the opinion reversing the case.