Miles Jackson JERNIGAN, Appellant,

v.

The STATE of Texas, Appellee.

No. 57277.

Court of Criminal Appeals of Texas, Panel No. 1.

June 20, 1979.

Rehearing En Banc Denied Nov. 28, 1979.

Jack R. Bailey, Marvin O. Teague, Houston, for appellant.

Tom Hanna, Dist. Atty. and John R. DeWitt, Asst. Dist. Atty., Beaumont, Robert Huttash, State's Atty., Austin, for the State.

Before ONION, P. J., and ROBERTS and CLINTON, JJ.

## OPINION

CLINTON, Judge.

The offense is arson as proscribed by Article 1304 and related provisions of Title 17 in the 1925 Penal Code. Upon a jury verdict of guilty, the trial court assessed punishment at 10 years confinement in the Texas Department of Corrections.

The judgment of conviction is assailed by twenty-one grounds of error, the first three raising sufficiency of the evidence to support the verdict in this circumstantial evidence case.[1] To provide a setting for consideration of certain grounds of error other than those contesting sufficiency of the evidence, we first sketch profiles of the dramatis personae, review and critique the plot outlined by the State and then decide particular grounds of error that are raised.

The appellant is Miles Jackson Jernigan. At all material times he was 57 years of age; at first single but then married. He came to Port Arthur from Pensacola, Florida where he and other members of his maternal family permanently resided. His brother is Frank Jernigan at whose instance, appellant testified, he first helped remodel and then worked as a commission salesman in the furniture store in Port Arthur that became the victim of the alleged willful burning. Appellant, with others, began the remodeling work around January 1, 1971 and, for a while, resided with Ray Underwood across the street from the furniture store.

Ray Underwood, who did not testify and whose background is not revealed, was a commission salesman at the furniture store for a short period of time in the spring of 1971. He lived with his family in the house across the street, shown to have been owned by Frank Jernigan.

1. The cause was submitted on briefs of the parties without oral argument. The brief of each party was prepared by counsel who did *not* participate in the three week trial that produced nine volumes covering more than 2,100 pages of transcription of notes of the court reporter, an additional volume of the transcript prepared by the clerk that contains some 165 pages. For his part appellant, after quoting from and citing many legal authorities concerning appellate review of evidence in arson cases, submits that one who reads all the testimony can and will conclude that the evidence is simply insufficient to sustain the verdict and, without at all analyzing the evidence, urges that a new trial be granted. The State presents a summary of the testimony adduced from each witness it presented, lists the defense witnesses and identifies inclusive pages in the record where their testimony may be found, refers us to and urges that we read a portion of the argument of a prosecuting attorney that is said to summarize all of the testimony, to discuss and analyze defensive testimony and to explain sufficiency of evidence and make observations concerning other grounds of error relating to "corporate charters and various lawsuits;" with this, the State submits that the verdict was amply supported. Barely aided by such limited assistance from briefs of the parties, we have reviewed the record in its entirety with an eye more to issues raised by other grounds of error and, having determined, for reasons about to be stated, that some of them must be sustained and the case reversed, we do *not* decide sufficiency of the evidence to convict. (All emphasis is supplied throughout by the writer of this opinion unless otherwise indicated.)

Calvin W. Wilson is an attorney who practiced law in Pensacola, Florida and from time to time before 1971 represented appellant in collecting payments for services rendered by appellant in his small appliance repair business in Pensacola. Wilson also, as the State puts it, "figures prominently and recurrently" in the evidence, albeit in absentia.

LeRoy Morris also found his way from Pensacola, Florida to Port Arthur in 1971 where he was employed as assistant to the manager of the furniture store—that being, according to Morris, Frank Jernigan. Coming to Port Arthur in May to go to work for Frank Jernigan, Morris was soon coordinating all advertising of the furniture business for the Port Arthur store and another business in Lake Charles, Louisiana that was opened in June 1971. The Lake Charles operation was under the supervision of Frank Jernigan and when that business was incorporated Morris became an officer of the corporation along with Calvin Wilson as president and Dewey Godwin as vice-president.

Dewey Godwin is a son-in-law of Frank Jernigan. Like several others he came to Port Arthur from Pensacola and worked as a salesman in the furniture store. He was, at pertinent times, twenty-five or twenty-six years old.

Arthur "Slim" Stewart was apparently a resident of Port Arthur who went to work in the furniture store under the supervision of Frank Jernigan when the store was opened; he was in charge of shipping and receiving and also worked as a salesman. After Ray Underwood moved out, Stewart resided in the Frank Jernigan house across the street from the furniture store. He was an employee when the store and its contents burned on the evening of Sunday, November 7, 1971.

J. Lowery, apparently the same person as Shelby Lowery, resided in Groves, near Port Arthur, but worked in the furniture business in Lake Charles as a salesman until Morris left there as manager to return and work full time in Port Arthur. Lowery then opened and operated still another furniture business in Port Arthur. When the Lake Charles operation closed down, much of the furniture stock in that store was moved to the Lowery business. Lowery did not testify and at the time of trial was believed to be somewhere in Florida.

Carl Parker, a State Senator, is an attorney who practices law in Port Arthur. He drew several of the papers and instruments admitted in evidence, over objection of appellant, representing, according to his testimony, Frank Jernigan. On occasions he had conversations with the Pensacola lawyer, Calvin Wilson.

*Inter alia,* the indictment alleged that appellant "was the owner" of the willfully burned building. See *Barnes v. State,* 135 Tex.Cr.R. 111, 117 S.W.2d 441 (Tex.Cr.App. 1938).

Among other exhibits offered by the State to show ownership in appellant, there was admitted over objection State's Exhibit 3, purporting to be a deed by which Sabine Realty Company conveyed to Miles J. Jernigan real property in Port Arthur described by lots and block numbers.[2] Further, over objections that it was hearsay and constituted a conclusion and speculation, an investigator for the district attorney was permitted to testify that the property described in the deed was commonly known as 1401 Gulfway Drive in Port Arthur—that, of course, being the address of the burned building and its contents at issue.

In addition to whatever other undisclosed consideration was involved, the deed from Sabine Realty to appellant recited the sum of $8,000.00 evidenced by one certain prom-

2. Certified by the Jefferson County clerk to be a true and correct copy of the instrument that appears a record in the deed records, admission of the deed was objected to because, *inter alia,* the notice requirements of Article 3726, V.A. C.S., had not been complied with by the State. The objection was overruled and the instru-ment admitted. Appellant makes no complaint here concerning that ruling and it is readily apparent from the record that thereafter all parties treated the instrument as being precisely what it purported to be. Accordingly, we accept it as a conveying instrument.

issory note payable in monthly installments of $250.00 each, the first one of said installments being due and payable on or before the 18th day of December, 1970 and one of said installments being due and payable on or before the 18th day of each succeeding month thereafter until fully paid, payment of which was secured not only by a vendor's lien retained against the described property but also a deed of trust described in the deed. In this instrument appellant was expressly described as "a single man."

Further, the State introduced through an insurance broker an insurance policy issued to Miles J. Jernigan, as insured, in the amount of $8,000.00 coverage against perils of fire and extended coverage on the building at 1401 Gulfway Drive in Port Arthur. The policy is dated February 20, 1971 and was for a period of one year. The broker testified that both appellant and his brother, Frank, were present when he caused the policy to be issued but he did not say for sure which one asked him to issue it. The broker, in his capacity as a realtor, had earlier sold the furniture store property for Sabine Realty Company; he definitely recalled talking with Frank Jernigan about it and only "believed" that appellant was with him; although he could not remember the exact amount of the earnest money deposited, he thought it was from $1,300.00 to $1,500.00 and "believed" that Frank Jernigan had put up the money.

■ March 15, 1971 Articles of Incorporation were executed by Calvin W. Wilson, Ray Underwood and Miles J. Jernigan, as incorporators. The articles had been prepared by Carl Parker and the affidavits of the incorporators were taken by a secretary in his office; one affidavit was for Calvin W. Wilson alone, whereas the other was for Ray Underwood and Miles J. Jernigan together. As well as incorporators, the same three were constituted the initial board of directors to serve until the first annual meeting of shareholders or until successors were elected and qualified. Carl A. Parker was designated registered agent. The Articles of Incorporation were filed with the Secretary of State of Texas March 17, 1971.[3] The legal name of the corporation was Treasurehouse Furniture, Inc., but was commonly called Treasure House.

Another Port Arthur insurance and real estate agent testified for the State that some time in February 1971 he sold to Frank Jernigan the house on Gulfway Drive across the street from Treasure House and later on he covered Frank's automobiles and fleet of trucks with insurance as well as talking with him about fire insurance, workers' compensation and liability. With respect to Treasure House, the insurance broker wrote or caused to be written four separate insurance policies, each dated September 16, 1971. One policy provided $5,000.00 coverage against perils of fire and lightning and extended coverage on the building and $10,000.00 coverage on contents of the building; the additional three policies each provided $5,000.00 coverage on the building and $20,000.00 coverage on its contents. Coupled with the $8,000.00 policy

---

**3.** According to Article 3.01, of the Texas Business Corporation Act in effect at the time, the only eligibility requirements for incorporators of a Texas corporation was that they be twenty-one years of age and two of the three be citizens of the State of Texas. It is axiomatic that an incorporator need not own any portion of the capital stock of a corporation. Appellant testified that he was never a shareholder in the corporation and, while his testimony may have been rejected by the jury, there is no other evidence in the record that shares were ever issued to him. Moreover, according to Article 3.06, Texas Business Corporation Act, again in effect at pertinent times, the organizational meeting of directors named in the Articles of Incorporation is held upon call of a majority of the incorporators for the purpose of adopting bylaws, electing officers and transacting such other business as may come before the meeting. Again, appellant testified that he did not know anything about the incorporation and that it was owned and operated by Frank Jernigan and, while his testimony may have been rejected by the jury, there is no other evidence in the record that appellant ever actually served in the capacity of director or officer of the corporation. Indeed, Attorney Parker testified that after the corporation was chartered he turned it over to Frank Jernigan who thereafter on occasions would bring the corporate book down personally for Parker to instruct him as to making the minutes of the corporation.

issued February 20, 1971, in the name of Miles J. Jernigan, the existence of which Frank Jernigan informed the insurance broker, then, the total building coverage was $28,000.00 and contents was $70,000.00. The four policies named the insured as "CALVIN W. WILSON DBA TREASURE HOUSE FURNITURE COMPANY" at the instance of Frank Jernigan who insisted that policies initially issued in his name be reissued in Wilson's name as well as the premium note for payment of the balance due. The first payment of premiums was by check drawn on a Treasure House account that the broker himself picked up and "believed" was signed by Mrs. Frank Jernigan. The broker was clear, however, that appellant never gave him any instructions concerning the policies or had anything to do with them or paying any money toward premiums due.

Appellant married Mary Avery September 4, 1971.

The fire occurred Sunday, November 7, 1971 at about 6:00 p. m.

The State further proved that on or about March 9, 1972 the claim under the $8,000.00 building policy was paid in full by a check in that amount as well as another in the amount of $573.40 as unearned premium. The insurance broker recalled and interpreted notations on the papers to mean that the payoff checks were picked up by Attorney Parker, although the payee was Miles J. Jernigan.[4] The State then had admitted a certified release of vendor's lien

executed March 21, 1972 by Sabine Realty Company and a March 23, 1972 warranty deed by which Miles J. Jernigan conveyed the furniture store real property to Attorney Parker.

■ When the State rested its case in chief, then, from the proof it adduced on the matter the State's theory of the essential element of ownership of the furniture store was that record title was in the name of appellant and, concomitantly, the $8,000.00 insurance policy and check in that amount for the loss were issued in his name. With respect to the furniture business—as distinguished from the bare building that housed it—the State introduced the Articles of Incorporation of Treasurehouse Furniture Inc. on the theory that it showed appellant possessed an interest in the business —indeed, the State argued to the jury, quite erroneously, from the fact that persons, including appellant, were named as incorporators and initial directors, that they were the three "stockholders" in the corporation.[5]

Appellant's first witness in defense was an attorney who also owned Port Arthur Abstract Company. From business records he testified that on December 28, 1970 his office prepared an assumption deed from appellant to Frank W. Jernigan, et ux, conveying the furniture store property at 1401 Gulfway Drive. He identified Nina Hetherwick as his secretary; her name appears as the notary public who took the acknowledgement of the officer of Sabine Realty

---

**4.** Parker testified that he did receive the $8,000.00 check and thereafter drew and had appellant execute a deed, admitted in evidence as a State exhibit, whereby the real property on which the furniture store building had been situated was conveyed to him by appellant. Parker explained that although he regarded legal title to the property to be in Frank and Kathryn Jernigan, by reason of the earlier unrecorded assumption deed, since it was reported to him that Kathryn Jernigan was in Florida he considered it expedient to exclude the unrecorded deed from the chain of title and prepare and file for recording a conveyance from appellant to him. Further, he did receive the check from the insurance broker, gave it to Frank Jernigan to have Miles Jernigan endorse it and after that was done paid off the mortgage lien and other indebtedness, including a bill for

automobile insurance owed by Frank Jernigan, and obtained appropriate releases. He received the real property in payment of fees owed by Frank Jernigan and eventually sold it for $4,000.00. Neither his testimony nor anything else in the record shows that appellant personally received any of the proceeds of the $8,000.00 insurance payment.

**5.** "The stockholders were Wilson, Underwood, Miles Jernigan . . . * * * Now, these are the people who are on record as stockholders . . ."

Of course, as pointed out in n. 3, supra, that he was an incorporator and initial director does not make appellant a stockholder nor give him any financial interest in the business.

Company on the deed conveying the property to appellant. Apparently willing to accept the witness as an expert in real estate law, on cross-examination the State obtained his legal opinion that an assumption deed conveys title to the property to its grantees.[6] His conclusion was further explicated on re-direct examination:

"Q: Now, as to between this assumption deed that you drew, if it had been executed, it would have conveyed title from Miles Jernigan to Frank Jernigan and his wife, is that correct?

A: Yes, sir.

Q: Now, when you are referring to the fact that later on, from what you determined from the records, that deed didn't appear of record that would mean that as far as the record is concerned Miles Jernigan— that would leave Miles Jernigan free to convey that property to a third party?

A: Yes, sir.

Q: As between Frank Jernigan and Miles Jernigan, though, it conveyed title and it remained conveyed between those two parties, is that correct?

A: If it was executed and delivered, it did.

* * * * * *

Q: . . . on November the seventh, nineteen seventy-one, if the deed, the assumption deed, which you drew had been signed and delivered—signed by Miles Jernigan and delivered to Frank Jernigan, as far

as the true title to that property on November the seventh, nineteen hundred and seventy-one, who would have owned the property?

* * * * * *

A: * * * Based on the facts of your question, I would say that Frank Jernigan, et ux, his wife, owned the property."

Having presented evidence of the assumption deed and with the expert testimony as to title in the record, appellant immediately moved for an instructed verdict, in part contending that requisite ownership was not shown. The motion was overruled.

The next witness presented by appellant was Attorney Carl Parker. While he was testifying, Carl Parker produced and the trial court admitted without objection an instrument denominated by the parties as an assumption deed by which Miles J. Jernigan conveyed to Frank K. Jernigan and wife, Kathryn Jernigan, real property in Port Arthur described exactly as in the deed from Sabine Realty to Miles J. Jernigan. The acknowledgement on the deed was taken by Nina Hetherwick.[7] This deed also describes appellant as "a single man."

■ On a date not clearly revealed in the record but believed by him to have been soon after the start of the furniture business in Port Arthur, Attorney Parker drew a lease of the building from appellant to either Calvin W. Wilson, individually, or to Treasure House Furniture, Inc. A copy of the lease could not be produced by Parker since he had turned over his Treasure House file to Frank Jernigan.[8] Although

6. "Q: Now, what happened in an assumption deed, where he gives an assumption deed to somebody, what does that mean?
A: Well, the purchaser—to whom he is conveying the property takes title to the property subject to an outstanding indebtedness.
Q: And agrees to pay if off?
A: That's right."

7. Hetherwick testified that she was a closer for the Port Arthur Abstract Title Company and that the Sabine Realty-Jernigan deed was drawn at her company while the Jernigan-Jernigan deed was ordered by it. She confirmed

that the acknowledgements were taken on the respective dates shown in her hand.

8. Appellant, being cross-examined by the State, did not recall signing a lease of the premises over to Calvin Wilson and was then confronted with a statement given after the November 7, 1971 fire in which it is reported that although he does not recall the date, "I leased the property to Mr. Calvin W. Wilson, owner and operator of the Treasure House Furniture Company. . . . The rent was $250⁰⁰ per month, and I do not have any interest in the business whatsoever."

unable to recall whether the lease of the building was to Calvin Wilson, individually, or to Treasure House Furniture, Inc., Parker did identify Wilson as the president of the corporation.[9]

In further cross-examination of Parker the State inquired whether he was "aware of the financial condition of the business, of the Treasure House Furniture Company." When Parker responded that his awareness was only "in a limited sense," he was asked to "elucidate on that just a little bit," and he answered by referring to "a civil suit for them." Under questioning he went on to explain that he thought the suit was by a local utility company against Frank Jernigan, dba Treasure House and concerned a

"disagreement" over the light bill. The court sustained an objection to a question as to whether the light bill had gone unpaid for a period of time and the State then moved into another area, but later returned to the matter of Parker's "knowledge" that the instances alluded to were the only complaints and only financial difficulty that Treasure House had at the time. The State then revisited the law suit brought by the utility company for an amount, Parker believed, of about $800.00. Without further predicate the State had marked for identification four exhibits, numbers 36, 37, 38 and 39, and Parker was asked to examine them and state whether he recognized them. Upon his answer, "I recognize them," the State tendered the exhibits into evidence.[10]

Appellant explained that at first he merely initialed at the top of both pages of the statement prepared by someone else and only signed it after being advised by Attorney Parker in a telephone conversation to do so. Since the statement was introduced for purposes of impeachment only, we cannot accept it as substantiating the fact that there was such a lease. 1 Texas Practice 532, McCormick & Ray, Evidence, § 688.

9. While not alluded to by the parties, that Wilson was president of the corporation soon after the business started is significant. Since election of officers is a statutorily mandated item of business at the first meeting of the initial board of directors, see n. 3, supra, the clear inference to be drawn is that the first meeting was, in fact, held. After a corporation has thus been "organized" and put in business under the direction of its officers, it is not at all unusual for members of the initial board of directors to be replaced by others whose interests, financial and otherwise, are more directly implicated by successful management of the business. There is in the record testimony that Underwood terminated his employment in about May and left Port Arthur and that appellant, himself, severed his relationship thereafter, returned to Pensacola and did not come back to work as a salesman, at the special insistence of Frank Jernigan, until about October. Given the extended absences of these two members of the initial board of directors, and Parker's testimony that from time to time Frank Jernigan came to his office for directions concerning making up the minutes of the corporation—minutes ordinarily are kept only of meetings of the board of directors and the shareholders—one may at least surmise that Underwood and appellant had, indeed, been replaced and were no longer serving as directors. In any event, Parker testified that Frank Jernigan was "the man-

ager and really the driving force behind the Treasure House Furniture Company."

10. Exhibit No. 36 reflected the litigation over the utility bill described by Attorney Parker. After objections directed to it and others the State announced that it was temporarily withdrawing it "for the proper predicate." Subsequently it and related instruments were admitted, again over objection, as Exhibits 40A and 40B, described infra in n. 13.
Exhibit No. 37:
Suit on Sworn Account. *Jack Pearce Co. v. Treasure House, et al.* No. A–96,587, 58th District Court of Jefferson County, Texas, Named Defendants: Treasure House, Treasure House, Inc., Frank Jernigan, Mrs. Frank Jernigan, Individually and D/B/A Treasure House and/or Treasure House, Inc. Amount: $2,320.08. Suit filed November 3, 1971. Appellant is not named therein.
Exhibit No. 38:
Suit on Sworn Account. *J. Isenberg & Son, Inc. v. Treasure House Furniture, Inc.*, District Court of Jefferson County, Texas, No. A–96,651, Named Defendant: Treasure House Furniture, Inc. Amount: $3,268.35. Suit filed November 15, 1971. Appellant is not named therein.
Exhibit No. 39:
Suit on Sworn Account. *Teledyne Packard Bell Distributing Company v. Treasure House, Inc.*, 60th District Court of Jefferson County, Texas, Named Defendant: Treasure House Furniture, Inc. Amount: $6,514.00. Suit filed November 8, 1971. Appellant is not named therein.
Exhibit 37, 38 and 39 is each an original petition with attached bills, invoices and the like showing an account. That citation was ever issued and served is not shown by an executed return; nor is there an answer in the record.

The statement of objections by appellant, of justification by the State and the colloquy with the court—all outside the presence of the jury—consume almost twenty pages of the record; accordingly we summarize the matter.

Appellant objected on the following grounds:

1. Not in compliance with Art. 3731a, V.A.T.C.S., Official Records Act;

2. No notice;

3. No proper predicate;

4. No connection with this Defendant;

5. Lawsuit was filed subsequent to fire;

6. Irrelevant to this lawsuit;

7. "And all of this is outside the hearing and the knowledge of the Defendant, Miles Jernigan;"

8. Surprise;

9. Prejudice;

(Though expressly requested, the trial court denied appellant the opportunity to adduce testimony on surprise and prejudice.) [11]

10. Lack of connection between corporation in Louisiana and Texas corporation.

11. Hearsay.

The justification submitted by the State for all exhibits was threefold:

1. The Official Records Act, Art. 3731a, V.A.T.C.S., anticipates "some type of detrimental aspect" and "there has been no showing of that here;"

2. Given the existence of the statute, it could have based a motion for discovery and appellant did file other discovery motions but made no attempt to learn of the petitions;

3. That the court was well aware of what the circumstances are in this case: "(I)t was set out as a scheme and plan of Frank Jernigan, Miles Jernigan, and Calvin Wilson—on the part of Frank Jernigan, Miles Jernigan, and Calvin Wilson and others to mislead the public as to what-who the owner of the building was, who the owner of the business was, their attempts and schemes to hide it and for that reason I would suggest that any lawsuit against anyone who was in that particular business, Treasure House, should sufficiently put all members of that corporation on notice of that lawsuit . . ."

Appellant rejoined, as to the possibility of discovery, "The purpose of this very article is that you give notice to the adverse party that you intend to use this so there would not be any surprise and I am completely surprised and that we are prejudiced thereby." As to Exhibit No. 38, specifically, the State then argued that the point in question is "*the financial status,* not the fact that the lawsuit had actually physically been filed" at the time it was. When the trial court hesitated because some of the attached bills and invoices named the business in Lake Charles, the State argued that "this group is actually the same group who had prior to that time been doing business under this same name in Lake Charles . . . and as a practical matter the bills of laden (sic) attached thereto relate both to the Lake Charles store which was still going on during the period of time the store in Port Arthur was being operated and to the Port Arthur store . . ." When appellant challenged statements as to the sameness of the corporate entity and pointed out there was no proof in support of the theory advanced by the State, the court remarked that "just to be on the absolute safe side I will hold up on thirty-eight until more has been shown." The State then disclaimed

<hr>

11. "THE COURT: * * * (T)he Court finds no surprise or prejudice to the defendant in the tender of these exhibits.

MR. MCGRATH: Your Honor, I would like to put on some testimony concerning my surprise and the prejudice to the defendant if the Court is going to make that finding.

THE COURT: No.

MR. MCGRATH: The Court will not let me put on any testimony showing my surprise and prejudice to . . .

THE COURT: We are not supposed to have a hearing on that . . .

MR. MCGRATH: I am just asking may I do that?

THE COURT: No."

any intention to prove that the same corporation was doing business in Louisiana or that the incorporators, directors and officers of the Louisiana corporation were the same people named in the Articles of Incorporation in Texas, but insisted that the whole point of these exhibits was:

"We've got a group of people who moved in this community for one purpose and that one purpose was to set up a business to get the people and to get out as quickly as they could and if the State is denied the right to show this to the jury we are going to go in with the jury completely blindfolded as to what the true state of affairs was." [12]

Subsequently, in further cross-examination of Attorney Parker, the State drew testimony of his representation of Frank Jernigan personally in some litigation filed against him and against Treasure House Furniture Company in Port Arthur for some kind of debt in Louisiana and that he filed an answer to the effect that they were separate entities and Frank Jernigan was not an owner and "that was the end of it." Shown State's Exhibit 38, Parker recognized it as a petition but not the one that instigated the suit he had just testified about; further he did not recall representing Treasure House Furniture Company in the particular lawsuit reflected by Exhibit 38. Whereupon the State then tendered Exhibit 38 "as being sufficient on itself, a certified copy of a lawsuit . . ." Appellant renewed his objections, particularly because it had just been shown that he had no interest in the business; the State, however, contended that because he was shown to have been an incorporator and a member of the board of directors, "I think he has notice of it." Finally, without further ado, Exhibit No. 38 was admitted.

Thereafter, while Attorney Parker was still testifying, he was shown Exhibits 40A and 40B and examined them. When he stated he recognized them, the State then completely withdrew its tender of Exhibit No. 38 and tendered State's Exhibit 40A and 40B.[13] To admitting the exhibits, appellant objected on grounds that because they named only Frank Jernigan, individually, they were irrelevant and immaterial to any issue involving appellant and were all matters outside the hearing and knowledge of appellant, not material under the allegations of the indictment and are "pure hearsay" as to appellant. The exhibits were admitted.

During the cross-examination of Leroy Morris, the State produced and had marked for identification Exhibits 41 and 41A.[14] Morris denied having ever seen the exhibits before. The State then produced and had marked for identification Exhibits 42 and 42A.[15] The witness answered affirmative-

---

**12.** Appellant objected to the latter statements and during the ensuing exchange the court stated that it was listening, "but it really doesn't mean anything," and pointedly said to the prosecuting attorney:

"Oh, I think your sematics (sic) are entertaining, but they really do not have much to do with the merits of this trial right now. * * * I don't believe I will admit thirty-eight at the moment. If you think at some later date it becomes admissible you can tender it."

**13.** Exhibit 40A:

Light Bill. *Gulf States Utilities Co. v. Frank W. Jernigan,* County Court of Jefferson County, Texas, No. 27,107, Named Defendant: Frank W. Jernigan. Amount: $495.01. Suit filed November 15, 1971. Appellant is not named therein. Agreed Judgment rendered in favor of Plaintiff in amount of $350.00 unless if not paid in 6 months, then became $495.01 and execution to issue. Judgment signed March 27, 1972.

Exhibit 40B:

Answer of Frank W. Jernigan to petition, Exhibit 40A.

**14.** Exhibit 41:

Advertising Bill. *Calcasieu Television & Radio, Inc. v. Treasure House Furniture, Inc., et al.,* County Court of Jefferson County, Texas, No. 27,043. Suit filed October 22, 1971. Named Defendants: Treasure House Furniture, Inc.; Treasure House Furniture Co. of Lake Charles, Louisiana; Miles J. Jernigan; Ray Underwood; Calvin Wilson; and Dewey Godwin. Amount: $5,189.50.

Exhibit 41A:

Original answer of Treasure House Furniture, Inc. (If other named defendants in the petition, including appellant, filed an answer, the record does not contain it.)

**15.** Exhibit 42:

Advertising Bill. *Dixie Broadcasters, Inc. v. Treasure House Furniture, Inc.,* County Court

ly, that he was familiar "at least with the subject matter" of the lawsuit initiated by Exhibit No. 42. On voir dire examination the witness said he had heard that the suit had been filed but he was never served with citation nor had he seen either one of the exhibits. Whereupon during the course of another lengthy colloquy, appellant objected to all four exhibits, 41, 41A, 42 and 42A, on essentially the same grounds heretofore outlined in connection with the earlier similar exhibits offered and admitted, including lack of notice, surprise and prejudice. To that, the State submitted the exhibits were admissible on their face without any type of identification, being certified records; since the appellant is listed as one of the defendants in the petitions, he cannot claim surprise;[16] and, finally, that the State had established by the witness that "this was all just one continuing operation, even though there may have been different corporate shelters." Settling an argument as to whether the testimony of the witness showed knowledge of the subject matter of the lawsuits, the court admitted the exhibits after making the following observations:

"I am not talking about what he may know about it, but—they may ask him about it and if he knows nothing about it, that's the end of it, but if he does then he can ask him about it. But the answer in either event is the sole criteria as to whether the items are admissible, or not."

From what we have gleaned from the record of the testimony from defensive witnesses Bass, Parker and Hetherwick and the revelations of stated purposes for admitting Exhibits 37 through 42A, it is at once apparent that the State shifted dramatically the emphasis of its theories of culpability. Its case in chief was designed to prove that appellant's culpability arose out of his ownership of the building and his "interests" in the Texas corporation that conducted the furniture business in Port Arthur. With its proof of that theory substantially weakened by the defensive testimony outlined, however, the State then turned to the notion that appellant was guilty by his association with a designing group of people determined to fleece its suppliers and the consuming public.[17] We

of Jefferson County, Texas, No. 27,049. Suit filed October 22, 1971. Named Defendants: Treasure House Furniture, Inc.; Treasure House Furniture Co. of Lake Charles, Louisiana; Miles Jernigan; Ray Underwood; Calvin Wilson; Dewey Godwin; and Leroy Morris. Amount: $612.50.

Exhibit 42A:
Original answer of Treasure House Furniture, Inc. (Again, if the other named defendants, including appellant, filed an answer, the record does not reflect it.)

16. As pointed out, supra, n. 10, the record does not demonstrate that appellant was ever served with citation or answered the petitions. We further observe that the certificates of the county court clerk attached to Exhibits 41A and 42A are for "Defendant's Original Answer" and are dated October 11, 1973—a date, shown by docket entries, to be one during which appellant was presenting his defensive testimony. Surely had the clerk's files contained an answer by appellant, the State would have obtained a certified copy and have put them in evidence to show his awareness of the petitions.

17. More colorfully, in its argument to the jury, the State alluded to the Cordoleones family, the Godfather of which was portrayed by Marlon Brando, Butch Cassidy and the Hole in the Wall Gang and then applied it as follows:

"Well, I got to thinking about Pensacola fitting that definition, maybe, with all these guys spreading out and every now and then one of them pops out and pops back in. Boy, they are slick.
The defendant had the motive, the ability, the interest to set that fire, more so than anyone else, and when you look right down at it what we've got is a bunch of wolves, rats and snakes and I don't think I can think up a term in my judgment which is low enough for these people to come in here and do that to their suppliers and move out with all that furniture sold to the customer and take all the money and burn the building down, take that, too. * * *
I have prosecuted a number . . . of murders and robberies and rapes in this courtroom and for whatever it's worth to you all there ain't anybody more sorry on the face of the earth in my judgment, than that bunch of rats that set up Furniture Liquidators in Lake Charles Treasure House, Port Arthur Treasure House, Al Foster's in Corpus Christi, Miles Jernigan in Tampa, Florida, Tupelo, Mississippi—and on and on and on. They come out of the Hole in the Wall, they take it, and get back. It's arson and it's deliberate, and I thank you for listening to me."

note the jury was not charged on the law of principals.

■ By his grounds of error 10 through 19 appellant contends that admitting the exhibits over the specific objections shown to have been made, the trial court committed reversible and prejudicial error. As to this, the State asserts in its brief that the suits were for "debts incurred" and even as to those exhibits in which only Frank Jernigan was the named defendant "debts of the business" would be of concern to all parties having an interest. With respect to lawsuits for "debts incurred" by the business in Lake Charles the State deems it significant that there were allegations that the Lake Charles operation had its principal office at 1401 Gulfway in Port Arthur and that in both suits answers were filed by Attorney Parker. Later the State points out that the suits were "for unpaid debts" and were "all for debts existing" at the time of the fire and tend to show that the businesses "were in bad financial straits at such time." Having just done so, in our view, the State disclaims that the exhibits were introduced to show the truth of the various averments therein, but yet thereafter argues that the agreed judgment was but "part of the evidence tending to show the very real financial woes of the business with which appel-

lant and his cohorts were connected." Suffice it to say that the exhibits were treated as showing some modicum of truth during the trial of the case, and the difficulty exhibited by the State in its brief in attempting to disassociate itself now from that treatment, satisfies us that the exhibits were improperly admitted and utilized.[18]

We believe and find that the holdings of *Oliver v. State*, 551 S.W.2d 346, 348–349 (Tex.Cr.App.1977) and cases cited therein, control disposition of the grounds of error under consideration, and require that they be sustained. As demonstrated, supra, one of the reasons expressed for admitting them and the very manner by which they were utilized in argument by the State belies any later claim that the exhibits were not admitted to show the truth of the statements contained therein. This being their purpose and function, the exhibits were "inadmissible as hearsay" here, just as similar pleadings and papers were in *Oliver*, supra.

In *Oliver* the State argued that Article 3731a, V.A.C.S., authorized admitting the exhibits. Here, while seeking to excuse its failure to comply with the notice requirements of the statute, the State apparently also relies on the Article, pointing out that each exhibit was properly certified. Their

Closing for the State, the district attorney argued that appellant was but a tool of his brother, Frank Jernigan, and that appellant "was at that time exercising dominion over, having an interest in, or exercising care and control of Frank Jernigan's property." After developing that line, he asserted that appellant "alone, of all the people who were involved in this whole conspiracy, was that closely tied to Frank Jernigan and that he would do what he said without question and without facts and he did it . . . ."

18. In its final argument, the State prepared some sort of diagram—it is not in the record before us—purporting to show the interweaving and interlocking relationship of the various players, as reflected by the several Articles of Incorporation and, more significantly for our purposes here, the six lawsuits. First the State totaled up the amount of damages sought and pointed out that such suits usually ask also for interest and attorneys' fees. Then the State called upon the jury to "read these—these names are on all these papers" and proceeded to summarize the nature of each lawsuit and

then explained the importance of the lines it had drawn to show the relationship: "Because you've got to be able to relate a particular person with everything in the chain, you see, . . . ." Referring specifically to the appellant, the State pointed out his name on the Articles of Incorporation, the $8,000.00 insurance policy, the assumption deed to Frank, the original deed from Sabine Realty, the release and the deed to Parker and, again referring to the diagram, pointed out, "A little bit further he's named as the defendant in two of the lawsuits." Similarly, the State argued from its diagram "You can take anyone of these people and just follow them down, everyone of them, just sift through like sand in one of those shaker things. It all settles down, and if you look at this thing and start counting names because Miles says, 'I wasn't involved in nothing.' One, two, three, four, five, six, seven, eight, nine, and count all of the other names you want and you're not going to find anywhere close to nine. Who's the kingpin?"

relevance aside,[19] the State did not deliver a copy of any exhibit to appellant "a reasonable time before trial," as required by Section 3, unless the trial court opines that appellant "has not been unfairly surprised" by that failure.

■ Here, unlike *Chatman v. State,* 513 S.W.2d 854 (Tex.Cr.App.1974), appellant objected on the very grounds that were omitted there. That the State did not give notice is uncontroverted. It must be remembered that the pre-trial process contemplated by the notice requirements is to put the accused on notice that an official writing will be introduced by the State during the course of the trial. The purpose of that notice is to enable the accused to prepare his defense by way of objections to admissibility of the writing, garnering evidence to refute or explain their intendments or whatever other defensive posture the circumstances may suggest. See, e. g., *Denham v. State,* 428 S.W.2d 814, 817 (Tex. Cr.App.1968). There, writing for the Court, Presiding Judge Onion reasoned that, as to record of a prior felony conviction, by its provisions Article 37.07, V.A.C.C.P.,[20] "puts every accused on notice that the State is entitled to show his prior criminal record" so that, in effect, the accused could not complain that the specific notice requirements of Section 3 had not been followed. Actual knowledge of the writing may be relevant on the question of unfair surprise, but it is not a substitute for advanced reasonable notice that the writing will be offered as evidentiary matter at trial. The obvious legislative objective was to encourage pre-trial disclosure in order to eliminate surprise to the adverse party and thereby avoid arguments and possible delay of proceedings during the course of the trial—an objective, we are constrained to remark, that was not achieved here.

■ To his claim of surprise and prejudice, without explicating the basis for doing so, the trial court not only summarily stated a finding of no surprise or prejudice but also just as sharply rejected the precise request of appellant to adduce testimony on the matters. In doing so, the court expressed the view, "We are not supposed to have a hearing on that . . ." and reiterated its denial of an opportunity for appellant to do so.[21]

*Denham v. State,* supra, is regarded as the genesis of the proposition that a violation of Section 3 is not perceived "when the trial judge . . . finds after an inquiry into the matter that the appellant was not unfairly surprised," 428 S.W.2d at 817.[22] Here, however, while the trial court heard objections to and justifications for admitting the exhibits and discussed them outside the presence of the jury, the court did not conduct an inquiry on the claim of surprise outside the presence of the jury, though twice requested to hear testimony on the issue. In the circumstances of this case, as we have set them out at some length, we find that the trial court erred in denying appellant the opportunity he sought to show surprise and, further, hold that the finding of no surprise by the trial court, without inquiry or hearing, does not permit this Court to conclude that the exhibits were properly admitted in evidence for consideration by the jury.

---

19. Each descriptive section of Article 3731a, supra, permits admitting the writing "so far as relevant."

20. ". . . evidence may be offered by the State and the defendant as to the prior criminal record of the defendant. . . ."

21. See n. 11, supra.

22. See *Smith v. State,* 439 S.W.2d 834 (Tex.Cr. App.1969), quoting at length from *Denham,* supra, and *Redd v. State,* 452 S.W.2d 919 (Tex.Cr. App.1970), characterizing *Denham* as dispositive and, on motion for rehearing, 452 S.W.2d at 923–924, noted that the trial court "held a separate and extended hearing" on the issue of surprise and described the resulting ruling admitting the exhibits as "a sufficient determination by the trial court that appellant was not unduly surprised . . ." See also *Sierra v. State,* 476 S.W.2d 285, 288–289 (Tex.Cr.App. 1972) and *Viera v. State,* 493 S.W.2d 160 (Tex. Cr.App.1973). In each case, as in *Denham,* the issue arose during the punishment phase of the trial when considerations of surprise may be, and often are, quite different from those obtaining during the guilt-innocence part of it.

█ We believe that the exhibits were harmful and prejudicial, *Yates v. State,* 489 S.W.2d 620 (Tex.Cr.App.1973) and cases cited therein, *Busby v. State,* 51 Tex.Cr.R. 289, 103 S.W. 638, 650 (Tex.Cr.App.1907). Further, because from the record before us there is ample evidence of facts and circumstances to suggest that appellant was, indeed, unduly surprised by the State's proffering the exhibits,[23] we conclude that the refusal of the trial court to receive testimony on the issue and then make a finding thereon was likewise reversible error. Grounds of error 10 through 19 are, therefore, sustained.

By his grounds of error 20 and 21, appellant asserts reversible error in admitting into evidence the deposition of Mrs. Nola Stutes and her husband, Arise Stutes, respectively, over objections. The Stutes resided near the furniture store and on the evening of the fire drove by it as they were returning home. Mrs. Stutes testified that near the store she saw a small green car that had to stop at an intersection for her to pass by and then pulled out in a hurry and "took off" in the direction she described. She further testified on direct-examination that she thought she could identify the driver of the green car and then proceeded to point out appellant as being the driver. Proceeding on to their home and pulling into the driveway she then observed smoke coming from a back window of the furniture store building, went immediately into her house and telephoned to report the fire. Mr. Stutes stayed by the car, saw the smoke and fire, moved his car to another location and then returned to water their garage with the garden hose to prevent it from burning. Both then observed the fire in progress and described their observations. Before trial, by agreement, appellant took the depositions of the Stutes,

drawing from each their observations of the green car, their movements and activities and descriptions of what they observed. After Mrs. Stutes testified on direct-examination appellant used portions of the deposition in an effort to impeach her, primarily as to her identification of appellant, prior purchases at the store and the extent of its business as it appeared to her. On re-direct the State referred to the same page 4 that appellant had utilized, directed her attention to a question and answer immediately preceding the one appellant had asked concerning the amount of business of the furniture store, got an affirmative answer to whether she remembered that line of questions and then the following occurred:

"MR. HANNA: Your Honor, I offer this deposition. It is some twenty-odd pages. Mr. McGrath has quoted portions of it and the State tenders the deposition as a whole. We think the deposition on the whole is admissible at this time.

Mr. McGRATH: Your Honor, the witness is here to question. I submit there, is no predicate set for the whole deposition, for the introduction of the whole deposition.

\* \* \* \* \* \*

THE COURT: Admitted."

Thereafter, the entire deposition was read to the jury by one prosecuting attorney asking the questions and the other reading the answers.

█ Plainly, under the circumstances, the entire deposition was not admissible at the instance of the State since much of it was in no way related to the limited portions presented by appellant in attempting to impeach the witness. *Earnest v. State,* 83 Tex.Cr.R. 257, 202 S.W. 739, 740 (Tex.Cr.App.1918).[24] Contrary to the assertion by the State that Article 38.24 authorizes admission of the entire deposition, the rule is

23. See nts. 3, 9, 10, 13, 14, 15, 16, and the text at page 6, supra, discussing the initial theory advanced by the State as to ownership and interests.

24. "If appellant introduced isolated portions of this examining trial testimony as impeachment or in contradiction of the girl's testimony on the final trial, then the State would have the

right to introduce such portions of her examining trial testimony as bore upon and were explanatory of those put in evidence by appellant, but that portion of the examining trial testimony that did not shed light upon those introduced by defendant would not be admissible."

not that broad, as explained in *Roman v. State,* 503 S.W.2d 252 (Tex.Cr.App.1974). We need not here undertake to reconcile *Roman* with *Cerda v. State,* 557 S.W.2d 954 (Tex.Cr.App.1977) upon which the State relies, for we are satisfied that the Stutes' deposition deals with many subjects, to some of which we have already alluded, and introduction of the entire deposition, therefore, is not limited to "the same subject" inquired about on cross-examination.

Ground of error 19 is sustained and; as in *Roman,* held to be reversible error.

▇▇▇▇ As to the deposition of Mr. Stutes, however, a different issue is raised. He did not testify. Representing he was unable to be present and testify, the State presented evidence through Mrs. Stutes as to his physical and mental condition as a result of a "stroke" suffered by him after giving his deposition. Hearing the matter outside the presence of the jury, the trial court explicitly found that Mr. Stutes had such bodily and emotional infirmity that he could not testify with sound memory and intelligence, and admitted his deposition.[25] The finding of the trial court is amply supported by the testimony of Mrs. Stutes so we can confidently say that the court did not abuse its discretion in admitting the deposition and permitting it to be read to the jury. Ground of error 20 is overruled.

The remaining grounds of error, other than the first three,[26] complain of testimony of Russell Landry, an investigator for the district attorney, concerning consumer initiated complaints about transactions with the furniture business, his contacts with some of its employees and Attorney Parker during the week before the fire and his inability to gain access to its books and records; in addition, error is claimed in admitting as an exhibit Articles of Incorporation of a Louisiana corporation named Treasure House Furniture Company of Lake Charles, Inc.[27] and Articles of Incorporation of a Texas corporation named Furniture Liquidators, Inc., filed October 13, 1971.[28] Without ruling directly on these grounds of error, we believe it sufficient to observe that the State offered the testimony and the exhibits on the notion that because appellant was the record owner of the building, was named as an incorporator and initial director of Treasure House and was associated in his employment at one time or another with many of the actors working there or named in the other corporate papers he had such an interest that, as the State puts it in its brief, would indicate "that its troubles would be his troubles," yet not showing any direct connection between him and them. Thus, notwithstanding his several conversations with employees and Parker, Landry conceded that he never saw or talked with appellant concerning the complaints he was investigating. Also, appellant was not shown to have any relationship whatsoever with the two corporations and, perforce, with their operations.[29] Without evidence tending to show

---

25. Article 39.12, V.A.C.C.P., *Forbes v. State,* 513 S.W.2d 72, 78 (Tex.Cr.App.1974).

26. See n. 1, supra.

27. The sole incorporator, as permitted in Louisiana, was Leroy Morris and its first directors and officers were Morris, Calvin W. Wilson and Dewey Godwin; Morris is shown as its registered agent at an address in Lake Charles, Louisiana and also as recipient of all authorized shares of stock in the corporation. Appellant's name does not appear anywhere among the papers.

28. Its incorporators and initial board of directors were Shelby Lowery, Arthur Stewart and Susan Lee Lowery. Appellant's name does not appear among these papers.

29. In its brief the State argues that appellant was a member of a group of persons that operated similar furniture discount businesses "under corporate fronts" and the two exhibits were admissible as circumstantial evidence tending to show existence of motive for appellant "as a member of this group" to torch the Port Arthur business. That appellant was such a "groupie" is tenuous at best but we fail to understand how the corporate charters shed any light, circumstantial or otherwise, on the matter of his motive. The State further contends that the papers of the Louisiana corporation were admissible to impeach the testimony of Leroy Morris on cross-examination that he had not received any stock in it when the exhibit itself recites he was issued 10,000 shares; similarly, that the corporate papers of Furniture Liquidators were admissible to impeach the testimony

that appellant was aware of Landry's investigation and had some connection with the other corporations, the probative value of the testimony and two exhibits, if any, appears practically worthless. In any event, because the case must be reversed on other grounds, we do not analyze and evaluate these grounds of error to the extent of ruling on them.

Having sustained grounds of error requiring that we do so, the judgment of conviction is reversed and the cause remanded.

of Slim Stewart that he did not have any interest in that corporation and there was no Furniture Liquidators before the fire, the State contending that the exhibit did show his interest in that he was an incorporator and initial director. We note that the offer of both exhibits was not limited for the purpose now stated and, when confronted with the statement in the former Morris reiterated that he never received the corporate shares; as to the latter, again, that Stewart is named as an incorporator and initial director does not *ipso facto* give him "an interest" in the corporation or its business.