395 S.E.2d 751

**HODGES REALTY CO., INC., etc.**

v.

**JOHN SMILEY'S MOTEL, INC., etc.**

**No. 18901.**

Supreme Court of Appeals of
West Virginia.

June 21, 1990.

Rehearing Denied July 24, 1990.

Dissenting Opinion July 25, 1990.

Rudolph L. DiTrapano, Joshua I. Barrett, DiTrapano & Jackson, Charleston, for Hodges Realty Co., Inc.

Guy R. Bucci, J. Michael Ranson, Bucci & Ranson, Charleston, for John Smiley's Motel, Inc.

BROTHERTON, Justice:

The appellant, Hodges Realty Co., Inc. (Hodges Realty), appeals from the September 26, 1986, decision of the Circuit Court of Kanawha County, entering judgment against the appellant, who sought to compel the appellee herein, John Smiley's Motel, Inc., and Robert M. Lovell (Lovell), who controls said corporation, to issue stock certificates to which Hodges Realty claims entitlement and ownership.

This rather protracted litigation began in September, 1972, when the appellant filed a civil suit against Lovell, demanding specific performance for the issuance of stock certificates in the corporation known as John Smiley's Motel, Inc., (Smiley's Motel), or, alternatively, damages for breach of contract. The appellant's complaint alleged that, as the assignee of George W. Hodges and Neola Hodges, Hodges Realty was the rightful owner of twenty percent of the shares of John Smiley's Motel, Inc.

In Hodges Realty's complaint, George W. Hodges described the transaction in which he acted as a broker and helped Lovell acquire the motel property from John Smiley. Hodges contends that, in consideration of his agreement to reduce his sales commission from six to three percent, and in further consideration of his co-signing a purchase money note in the amount of $300,000 to the sellers, Lovell agreed to give Hodges a 20% interest in the corporation which was formed in order to effectuate the purchase of Smiley's Motel.

In an amended answer filed on January 24, 1973, Lovell disputed the facts set forth in Hodges' complaint and stated that Hodges was supposed to pay Smiley $10,000 "under the table" in exchange for the interest in Smiley's Motel. In 1977, Lovell filed a second amended answer in which he stated that he himself had contributed a "secret" $5,000 payment to Hodges, which Hodges was then supposed to give to Smiley "under the table."[1] Upon concluding the deal, Lovell states that he believed Hodges' representation that such a pay-

ment to Smiley had, in fact, been made. In consideration of Hodges having made this payment, Lovell intended to convey the 20% interest in Smiley's Motel to Hodges. However, Lovell states that he subsequently discovered that Hodges had not made the payment to Smiley.

After surviving various motions to dismiss, this case eventually came to trial in June, 1985. An advisory jury was empaneled. The key parties to the transaction—George Hodges, Neola Hodges, Robert M. Lovell, John Smiley, and Louise Smiley—all testified to the circumstances involved in the purchase of the motel property and the incorporation of John Smiley's Motel, Inc. Testimony at trial centered on the alleged $15,000 "under the table" payment to John Smiley, the reason for the reduction of Hodges Realty's commission from 6% in the initial September 18, 1967 purchase agreement to 3% in the final September 21, 1967 agreement, and the consideration given by the various parties for the purchase of the property.

In both his petition to this Court and trial testimony, Lovell explained that, as a result of conversations with George Hodges, he became interested in acquiring the Smiley's Motel property located near St. Albans in Kanawha County, West Virginia, in September, 1967. Lovell began negotiations with the property owner, John Smiley, through Hodges Realty at that time. Lovell testified that he had known Hodges for several years prior to purchasing Smiley's Motel and Hodges had arranged for him to buy several other pieces of property during that time. Neola Hodges testified that she and another Hodges Realty employee solicited a listing agreement for the motel from John Smiley in July, 1967, but that prior to obtaining the listing she was not aware that Lovell was interested in buying the property.

The initial asking price for Smiley's Motel reported to Lovell by George Hodges was $420,000. Smiley and Lovell eventually signed a Real Estate Purchase Agree-

---

1. Hodges states that he contributed $10,000 to the purchase price by reducing his commission from six to three percent, but that he had nothing to do with the $5,000 payment, which he maintains involved a private agreement between Lovell and the seller, Smiley.

ment dated September 18, 1967, in which Smiley agreed to sell the property for $350,000, with $50,000 to be paid in cash at closing and the remaining $300,000 to be financed by the seller. Under this agreement, Smiley would pay Hodges a 6% commission.

However, because Lovell did not have the $50,000 in cash that he needed to complete this transaction, the arrangement was modified in a Real Estate Purchase Agreement dated September 21, 1967. Under this agreement, the purchase price was reduced to $335,000, with $35,000 to be paid in cash at closing and the remaining $300,000 to₂ be financed by the seller. Hodges Realty would receive a 3% commission under this agreement, approximately $10,000 less than the 6% commission provided by the September 18, 1967, agreement. This "reduction" in the commission paid to Hodges Realty constitutes the $10,000 contribution to the purchase price that George Hodges claims he made which, in turn, entitled him to a 20% interest in Smiley's Motel.[2]

In the petition for appeal, the appellant, Hodges Realty, maintains that additional terms of the modified purchase agreement were reflected in a handwritten document which revealed that the total purchase price would still be $350,000, but $15,000 in cash would pass to Smiley "under the table." Lovell denied that this document reflected the arrangement. While Lovell admitted that he still believed that Smiley was insisting upon having $50,000 in cash up front even in the modified agreement with the $335,000 purchase price, Lovell contended that this total was to be achieved through two "under the table payments" totalling $15,000[3] to Smiley in addition to the $35,000 cash[4] already recited in the sales agreement.

After Smiley's Motel was incorporated, George Hodges' wife, Carol, managed the business for approximately one year. However, Lovell became concerned when he received negative reports about how the business was being run, and he discussed these concerns with John Smiley. It was during discussions regarding replacing Carol Hodges that Lovell first became aware that Smiley had never actually received a $15,000 "under the table" payment from George Hodges.[5] After his conversation with Smiley, Lovell deduced that Hodges himself had kept the $5,000 in cash Lovell had given Hodges to give to Smiley and, moreover, that Hodges did not pay Smiley the additional $10,000 of his own money, which Lovell believed Hodges was going to give to Smiley in exchange for the 20% interest in Smiley's Motel. Therefore, Lovell did not give Hodges the stock certificates. Lovell stated, "They have never been issued for one thing and after I found out that he didn't pay anything ... I don't think he has got any coming."[6] Furthermore, Lovell stated:

> ... Hodges never asked for any certificates until about five years after I kicked him out of the motel ... he didn't do one thing until five years and then he went to Tom Moore to get the stock certificates ... five years after I kicked him

2. As the purchaser, Lovell claimed he had no interest whatsoever in what the commission was, since he wasn't the party who was responsible for paying the commission in this instance. Neola Hodges maintained that Hodges Realty Co. did not cut its commission. However, John Smiley, the seller who was responsible for paying the broker's commission, said that he insisted upon the commission being cut if the deal was to go through with the purchase price at $335,000.

3. Lovell apparently believed that Hodges was going to give Smiley $10,000 of his own money, in addition to the $5,000 which Lovell borrowed from his mother and gave to Hodges to then give to Smiley.

4. The $35,000 in cash was comprised of a $10,000 earnest money deposit Lovell had already given to George Hodges and $25,000 in cash to be paid at closing which was given to attorney Leonard Higgins.

5. Smiley testified that he never received any "under the table" payments and confirmed that he went to the Internal Revenue Service because he was concerned that the IRS might think that he had, in fact, received such money.

6. The testimony of the sellers of the property, John and Louise Smiley, fully corroborated the testimony given by Robert M. Lovell on the issues relevant to the sale of Smiley's Motel.

and his wife out of the motel … he wanted to get his stock certificates.

The documentary evidence introduced at trial included the Certificate of Incorporation of John Smiley's Motel, Inc., dated October 20, 1967, which was signed by Neola Hodges, George Hodges, and Mary Lockhart as incorporators.[7] The corporation began with capital stock in the amount of $1,000—ten shares worth $100 each. Paragraph five of the Agreement of Incorporation dated October 10, 1967, states that the number of shares of stock subscribed to by each incorporator were as follows: Mary Lockhart—8 shares; George Hodges —1 share; Neola Hodges—1 share. According to an undated document purported to be the minutes of the first meeting of the incorporators, George Hodges was chosen as Chairman and Neola Hodges as Secretary; Mary Lockhart, George Hodges, and Neola Hodges were elected to the Board of Directors of the corporation. Similarly, the undated minutes from the first meeting of the Board of Directors indicate that Mary Lockhart was elected President of the corporation, George Hodges, Vice President, and Neola Hodges, Secretary–Treasurer. As to the issuance of stock certificates, the minutes provided that:

> Upon motion duly made and seconded, it was resolved that certificates of capital stock of this corporation in the amount of One Thousand Dollars ($1,000) in a form submitted to this meeting, be issued at once; that certificate no. 1, for 8 shares of said capital stock be issued to Mary Lockhart; certificate no. 2, for 1 share of stock be issued to George W. Hodges; certificate no. 3, for 1 share of stock be issued to Neola Hodges; that the same be issued at once and be signed in the name of this corporation by its president with the corporate seal affixed thereto and attested by said president.

Although the certificates of stock were apparently prepared by the corporation's at-torney, Leonard Higgins, they were never executed.

In addition to the aforementioned documents, Lovell introduced two affidavits into evidence in which, under different circumstances, Hodges denied being Lovell's "partner" in John Smiley's Motel, Inc. In an affidavit submitted to the IRS regarding his 1967 income tax return, Hodges described the Smiley's Motel transaction as follows:

> During the year of 1967 The Hodges Realty Company had a listing of a piece of property for sale, by the name of Smiley's Motel. This property was owned by John and Louise Smiley.
>
> I personally handled the sale of this motel to Robert M. Lovell on or about October 25, 1967. The sales price of this Smiley's Motel was $335,000.00. Mr. Lovell had previously deposited $10,000.00 earnest money with Hodges Realty Company and Mr. Lovell paid an additional $25,000.00 down payment. The total of $35,000.00 was paid down on this motel. Neither I nor Hodges Realty Company paid any of this down payment. The Hodges Realty Company was paid $10,-050.00 commission by John and Louise Smiley for selling this motel.
>
> John and Louise Smiley were unwilling to accept Robert M. Lovell's signature on the note for the $300,000.00, but they agreed to accept this note if I personally endorsed the note.[8]
>
> I informed Mr. Lovell of this, and I agreed to endorse this $300,000.00 note if Mr. Lovell gave me 20% (twenty percent) of this corporation John Smiley's Motel, Incorporated, which we formed to take possession of the Smiley's Motel. Mr. Lovell agreed to this, and since my mother, Neola Hodges, and I share the profits of the Hodges Realty Company on a 50–50 basis, I told Mr. Lovell to put 10% (ten percent) of this corporation in my name

---

7. Mary Lockhart is the mother of the appellee in this case, Robert M. Lovell.

8. On the issue of the $300,000 note, John Smiley testified that he would have allowed Lovell to sign the note by himself and denied that he "forced" Hodges to sign the note. Smiley indicated that it was likely that he would have let Hodges take over Smiley's Motel in the event Lovell had defaulted on the note.

and 10% (ten percent) in my mothers name.

Neither I nor my mother have invested anything, money or otherwise, in this corporation, John Smiley's Motel, Incorporated. I did loan this corporation $1,000.00 and it still owes me this $1,000.00.[9]

The second affidavit was filed by Hodges in a lawsuit styled "Anchor Tobacco Company, Inc. et al v. Santon and Thomas Enterprises, Inc., a corporation, Judge Santon and David M. Thomas, Sr., Partners, d/b/a Steak and Lobster House; R. Lovell (Also known as Robert M. Lovell) and George Hodges, Partners, d/b/a Smiley's Motel Corporation, a corporation; and d/b/a Steak and Lobster House." At trial, Hodges explained that Santon and Thomas leased a restaurant in the Smiley's Motel complex and, when they went out of business, they left unpaid bills with suppliers. One of the suppliers was Anchor Tobacco Company. Anchor Tobacco not only sued Santon and Thomas, but the motel as well. After the lawsuit was filed, Hodges signed an affidavit dated March 3, 1969, in which he disavowed any partnership with Robert M. Lovell:

> I, GEORGE HODGES, being first duly sworn, do depose and say as follows:
>
> 1. That I am one of the defendants named in the suit of Anchor Tobacco Company, Inc., et al, v. Santon and Thomas Enterprises, Inc., et al, Civil Action No. 14,100–C, now pending in the Court of Common Pleas of Kanawha County, West Virginia; and
>
> 2. That said Amended Complaint alleges that R. Lovell and George Hodges are partners d/b/a Smiley Motel Corporation; and
>
> 3. That I am not now nor have I ever been at any time whatsoever a partner of R. Lovell (also known as Robert M. Lovell) in any business whatsoever nor have I at any time represented to anyone or allowed anyone to represent on my behalf that I

was a partner with R. Lovell (also known as Robert M. Lovell)....

Hodges maintains that, in a legal sense, he was never a "partner" with Lovell in the motel business, but that he was a stockholder in John Smiley's Motel, Inc. and eventually he assigned that stock to Hodges Realty.

Following presentation of the evidence at trial, the appellant's motion for a directed verdict was denied and the case was submitted to the advisory jury, which was instructed to respond to the following special interrogatories:

## SPECIAL VERDICT FORM

1. With respect to the cash payment of $5,000.00:

    a. Did Robert Lovell give the money directly to John Smiley?

    <u>No.</u>

    or

    b. Did Robert Lovell give the money to George Hodges to give to John Smiley?

    <u>Yes.</u>

2. Was the reduction of Hodges Realty Company's commission from six percent to three percent made as payment, in whole or in part, for twenty percent of the stock in Smiley's Motel, Inc.?

    <u>No.</u>

## SPECIAL INTERROGATORY NO. 2

Do you find from a preponderance of the evidence in the case that there was an agreement between the plaintiff and defendant which agreement was agreed to and understood by the parties and entered into for the purpose of which Smiley's Motel, Inc. would be formed with Lovell, paying cash of $40,000.00 and Hodges reducing his commission from 6% to 3%.

Please answer yes or no.   <u>No</u>

---

9. We note that in offering his own account of the motel property sale to the Internal Revenue Service, Hodges does not mention the supposed 3% reduction in the broker's commission that he now claims constituted his $10,000 consideration for the 20% stock ownership.

SPECIAL INTERROGATORY NO. 6A

Do you believe that Robert Lovell paid exclusively all considerations for the purchase of Smiley's Motel.

Please answer yes or no.   Yes

What amount do you believe if any George and/or Hodges Realty paid for the purchase of the motel.

 None ($0)

Do you believe that John Smiley required of George Hodges to co-sign the note as a requirement for him to sell the motel to Lovell.

Please answer yes or no.   No

Do you believe that plaintiffs reduced the commission price because they were requested to do so by John Smiley in order to receive any commission at all from the sale of the motel.

Please answer yes or no.   Yes

The parties were permitted to submit proposed findings of fact and conclusions of law. On September 2, 1986, the circuit court held for Robert M. Lovell, adopting the findings and conclusions submitted by defense counsel. In addition to the advisory jury's findings, the circuit court found that no contract came into existence for lack of proper consideration and the appellant was not entitled to any of the Smiley's Motel stock.[10] Lovell's ownership of the stock was affirmed and Hodges was denied relief as the court concluded that the contract was either fraudulently entered into or lacked consideration. Mr. Lovell was awarded $5,000. On January 12, 1988, the appellant's motion for a new trial was denied.

■ The appellant, Hodges Realty, now argues that the circuit court erred in refusing to hold, as a matter of law, that George and Neola Hodges were shareholders in John Smiley's Motel, Inc., and states further that the circuit court's ruling was contrary to West Virginia's corporation law and public policy. Specifically, the appel-

lant refers to W.Va.Code § 31-1-4 (1923), still in effect in 1967, which required that a corporation have a minimum of three incorporators:

> Any number of persons, *not fewer than three*, may associate to establish a stock corporation to engage in any lawful business or to promote or carry on any lawful object or purpose anywhere.... (Emphasis added.)

The appellant states that after the agreement of incorporation was filed and a certificate was issued, Mary Lockhart, George Hodges, and Neola Hodges became the corporation known as John Smiley's Motel, Inc. West Virginia Code § 31-1-8 (1923) provided, in pertinent part:

> When a certificate of incorporation shall be issued by the secretary of state, pursuant to this chapter, *the incorporators named in the agreement recited therein and who have signed the same*, and their successors and assigns, *shall, from the date of such certificate*, unless sooner dissolved according to law, *be a corporation*, with the right of perpetual succession, by the name and for the purpose, purposes, object or objects therein specified. And such certificate of incorporation shall be received as evidence of the existence of the corporation as aforesaid. (Emphasis added.)

However, the appellant incorrectly argues that the three incorporators must also be stockholders and concludes that, if the Hodges were not stockholders, then the corporation never legally came into existence. The appellant cites *Snyder v. Charleston & S. Bridge Co.*, 65 W.Va. 1, 63 S.E. 616 (1909) to support his contention that "since the law at the time of incorporation [W.Va.Code § 31-1-4 (1923)] required the corporation to consist of at least three persons, any action to deny the status of two of the three incorporators would also achieve the result, deemed unac-

10. The court also commented on the credibility of several witnesses, in particular, the sellers of Smiley's Motel, John and Louise Smiley:

> The Court finds that the testimony of John and Louise Smiley, neutral and independent witnesses, must be credited and that accord-

ing to their testimony they never received any money from George Hodges and that the sole exclusive reason that the Hodges Realty Company reduced its commission was for purposes of making the sale and did so at the insistence of John Smiley.

ceptable in *Snyder*, of rendering the incorporation deficient." The appellant concludes that, "the defendants ... cannot assert that there was a valid corporation without Neola and George Hodges." We find no fault with the Hodges' role as two of the three incorporators of John Smiley's Motel, Inc. However, an incorporator is not necessarily, by virtue of that role, also considered to be a shareholder.[11]

In *Snyder*, a certificate of incorporation indicated that the plaintiff held 100 shares of the capital stock. The defendants argued that the plaintiff had assigned his stock to another stockholder at one of the corporation's initial organizational meetings, a meeting at which he also tendered his resignation as a director of the company. The plaintiff denied ever disposing of his shares, and this Court subsequently found that:

> The certificate of incorporation shows ... that plaintiff was one of the charter members, and was the owner of 100 shares of the capital stock. He was also elected one of the directors at the first meeting held for the purpose of organization at which all the stock appears to have been represented, and was also elected to the office of vice president. This action, participated in by all the then stockholders, is in our opinion sufficient to estop the corporation from thereafter denying that plaintiff was a legally constituted member thereof on account of his not having paid anything upon his subscription.... The charter shows that $5,000 had been paid in, which is 10 per cent of the capital stock then subscribed, and from this it may be properly inferred that some one else paid the 10 per cent for the plaintiff. Furthermore, *the charter shows that there were only five stockholders who held all the stock at the time of the organization meeting. This was the minimum number of persons to whom a charter could be granted under the statute of West Virginia, and it follows as a necessary consequence that, if the plaintiff was not a bona fide stockholder at the time of the organization, there was in fact no corporation.* Our conclusion, therefore, is that the plaintiff was a bona fide stockholder....

*Id.* 65 W.Va. at 7, 63 S.E. at 618 (emphasis added).[12]

*Snyder* can be distinguished from the case now before us by examining the statutes which were in effect with regard to the mode of incorporation at the time of that decision. The Code of 1887, Chapter 54, Sections 6 and 7 provided that:

> 6. Any number of persons not less than five, desiring to become a corporation for any purpose or business designated in the second section, except for railroad purposes, shall sign an agreement to the following effect: "The undersigned agree to become a corporation by the name of (here insert the name by which it is intended the corporation shall be known) for the purpose of (here describe fully and particularly the purpose for which the corporation is to be formed, and the kind of business intended to be carried on by it), which corporation shall keep its principal office or place of business at _____, in the county of _____, and is to expire on the ____ day of _____. And for the purpose of forming the said corporation, we have subscribed the sum of _____ dollars to the capital thereof, and have paid in on said subscriptions the sum of _____ dollars, and desire the privilege

---

**11.** *See e.g., Jernigan v. State,* 589 S.W.2d 681, 686 (Tex.Crim.App.1979), in which the court addressed this same issue:
> ... the State introduced the Articles of Incorporation of Treasurehouse Furniture Inc. on the theory that it showed appellant possessed an interest in the business—indeed, the State argued to the jury, quite erroneously, from the fact that persons, including appellant, were named as incorporators and initial directors, that they were the three "stockholders" in the corporation.

The court then pointed out in a footnote that, "Of course, ... that he was an incorporator and initial director does not make appellant a stockholder nor give him any financial interest in the business." *Id.*

**12.** Although the Court determined that the plaintiff was a bona fide stockholder, he was nonetheless denied relief on the equitable theory of laches as a bar to the plaintiff's suit. *Id.* 65 W.Va. at 10, 63 S.E. at 619.

of increasing the said capital by the sale of additional shares, from time to time to _____ dollars in all. The capital so subscribed is divided into shares of _____ dollars each, which are held by the undersigned respectively as follows, that is to say: by (here insert the name of each incorporator, with his residence and the number of shares held by him). And the capital to be hereafter sold is to be divided into shares of the like amount. Given under our hands, this _____ day of _____."

7. No person shall be included as a corporator in any such agreement, by reason of any stock subscribed for by him, unless he has in good faith paid to the person who may have been appointed or agreed upon to receive the same for the intended corporation, at least ten per cent of the par value of the said stock.

When *Snyder* was decided by this Court in 1909, the "incorporators," or persons who executed the articles of incorporation, were also required to be "subscribers," and agree, at least initially, to buy shares and thus have a financial interest in the corporation.[13] However, this requirement that each incorporator pay at least ten percent of the par value of his stock was amended in subsequent statutory enactments. As we have previously noted, W.Va.Code § 31–1–4 (1923) lowered the requisite number of incorporators to three and omitted the above-quoted language regarding payment for stock by the incorporators.[14]

█ In the case now before us, an agreement attached to the certificate of incorporation did indicate that the three incorporators would also be stockholders. However, this was not specifically required by the statute in effect in 1967. As a result of the findings below on the issue of consideration, this Court cannot now find that Hodges Realty Co. is entitled to 20% of the stock in Smiley's Motel. After hearing the testimony of the key parties to the transaction, the trial court was convinced that George Hodges gave no consideration in exchange for the stock to which Hodges Realty Co. now claims entitlement. We conclude, therefore, that a person asserting an ownership interest in certain shares of a corporation is not entitled to receipt of such shares if it is determined that no consideration was given for the claimed interest in the corporation.

"Findings of fact made by a trial court may not be set aside by this Court on appeal unless they are clearly wrong." Syl. pt. 2, *Lewis v. Dils Motor Company*, 148 W.Va. 515, 135 S.E.2d 597 (1964). Be-

13. In general, an "incorporator" is defined as follows:

> The persons who become incorporated upon the formation of the corporation are called "corporators" or "incorporators." These terms are used interchangeably, and should not be used as synonyms for stockholders, shareholders, or members, who may be such by succession without having been incorporators, or as synonyms for subscribers, who may subscribe after incorporation and never become stockholders. The persons incorporated, the corporators, may not be stockholders at all or ever. In other words, an incorporator is one of the persons to whom the charter is granted in case of a corporation created by special act of the legislature, or one of the persons who executes the articles of association or certificate of incorporation in case of a corporation formed under a general statute providing for the formation of corporations. Corporators are mere instruments of the law for purposes of preliminary organization. The moment that is accomplished, the amount required as capital paid in, the necessary certificate signed, and the charter granted, they are functi officio, or, more accurately, they may then become stockholders. They exist before stockholders, and do not exist with them, for it is said that "when stockholders come in, corporators cease to be."
>
> 1A Fletcher, *Cyclopedia on the Law of Private Corporations* § 81 (Perm.Ed.1983) (footnotes omitted).

14. The national trend towards reducing the minimum number of incorporators continued in West Virginia. West Virginia Code § 31–1–26 (1988), as amended in 1974, states that, "One or more persons, or a domestic or foreign corporation, may act as incorporator or incorporators of a corporation by signing and delivering in duplicate to the secretary of state articles of incorporation for such corporation." *See* 1A Fletcher, *Cyclopedia on the Law of Private Corporations* § 81 (Perm.Ed.1983), noting that, "Many of the modern corporation codes incorporate the philosophy of the Model Act to the effect that the 'role of the incorporator is neither significant nor lasting in effect; it is now little more than ritualistic....'"

cause the appellant has not presented any evidence which convinces this Court that the findings of the advisory jury and trial court below were clearly wrong, we hereby affirm the September 26, 1986, order of the Circuit Court of Kanawha County.

Affirmed.

MILLER, Justice, dissenting:

My difference of view with the majority is that they fail to understand the legal principles that control this case.

It is not disputed that George Hodges and his mother were two of the three original incorporators of John Smiley's Motel, Inc. They co-owned Hodges Realty Co., Inc., the plaintiff below, and subsequently assigned their two shares of stock to that entity. The third incorporator was Mary Lockhart, who was Mr. Lovell's mother. The incorporation agreement, which was dated October 20, 1967 and introduced as Plaintiff's Exhibit No. 4, contained this information in Section V:

"The names and post office addresses of the incorporators and the number of shares of stock subscribed for by each are as follows:

\* \* \*

| [Name] | [Address] | [# of Shares of Common Stock] |
|---|---|---|
| Mary Lockhart | Panther [WV] | 8 |
| George W. Hodges | 1510 W. Summit [Dr.], Charleston, W.Va. | 1 |
| Neola Hodges | 4703 Kanawha [Ave.], S.E., Charleston, W.Va." | 1 |

In Section IV of the corporate charter, the total authorized capital stock was listed at $25,000, consisting of 250 shares of the par value of $100. This section also contains the following statement with regard to the initial issue of capital stock: "The amount of capital stock with which [the corporation] will commence business is One Thousand Dollars ($1,000.00) being Ten (10) shares One Hundred Dollars ($100.00) each."

Hodges Realty introduced into evidence, as Plaintiff's Exhibits 8 and 9, typed and signed, but undated minutes of the first meeting of the incorporators and the board of directors of Smiley's Motel. The incorporators' minutes show that Mary Lockhart, George W. Hodges, and Neola Hodges were elected as directors of the corporation. The board of directors' minutes reflect that the following officers were elected: President—Mary Lockhart; Vice–President—George W. Hodges; Secretary–Treasurer—Neola Hodges. These minutes also authorized the issuance of the capital stock shares by certificate number to each of the incorporators:

"Upon motion duly made and seconded, it was resolved that certificates of capital stock of this corporation to the amount of One Thousand Dollars ($1,000.00) in form submitted to this meeting, be issued at once; that Certificate No. 1, for eight shares of said capital stock be issued to Mary Lockhart; Certificate No. 2 for one share of stock be issued to George W. Hodges; Certificate No. 3 for one share of stock be issued to Neola Hodges; that the same be issued at once and be signed in the name of this corporation by its President with the corporate seal affixed thereto and attested by said President."

Hodges Realty also introduced shares of capital stock from the corporate stockbook. These stock certificates were typed, and the persons named, the certificate numbers, and the number of shares authorized therein corresponded to those set out in the minutes of the board meeting. The certificates were not dated or signed by the required corporate officers.

Hodges Realty argues that with this type of documentation, the proof of ownership was established as a matter of law under *Snyder v. Charleston & Southside Bridge Co.*, 65 W.Va. 1, 63 S.E. 616 (1909), and that as a consequence, the trial court

should not have permitted the advisory jury to make a finding as to whether any actual consideration had been paid for the Hodges' two shares.

In *Snyder*, the plaintiff sought to compel the corporation to issue him shares of its capital stock. The certificate of incorporation showed that the plaintiff was to have been issued 100 shares of stock as an original incorporator. Mr. Snyder attended the original organizational meeting on November 18, 1889, and was elected a director and vice-president of the corporation. Apparently, no stock was issued at this meeting or the next meeting in April, 1890. There was a dispute as to whether Mr. Snyder attended the next meeting on June 12, 1890,[1] at which the situs of the stockholders' and directors' meetings was changed from Charleston to Pittsburg, Pennsylvania, where the principal shareholders resided. At the next meeting, held on June 20, 1980 in Pittsburg, the company was reorganized. Although Mr. Snyder was not present, the minutes of this meeting showed that he had assigned his stock to another shareholder and had resigned from the board of directors.

Mr. Snyder filed suit to obtain his 100 shares. An attempt was made to defeat this claim based on his purported written assignment of the stock, a writing which he denied making. The stock assignment was not produced at trial, and the court rejected this defense.[2]

More significant to the present case, the corporation asserted that Mr. Snyder had not paid any consideration for the stock. This argument was rejected mainly on the ground that the corporation was estopped from impeaching its corporate records:

"The certificate of incorporation shows, however, that plaintiff was one of the charter members, and was the owner of 100 shares of the capital stock; he was also elected one of the directors at the first meeting held for the purpose of organization at which all the stock appears to have been represented, and was also elected to the office of vice-president. This action, participated in by all the then stockholders, is in our opinion sufficient to estop the corporation from thereafter denying that plaintiff was a legally constituted member thereof on account of his not having paid anything upon his subscription." 65 W.Va. at 6, 63 S.E. at 618. (Citations omitted).

Other jurisdictions couch this rule in slightly different terms, recognizing that a subscription by an incorporator who has been elected at an organizational meeting as a director is sufficient to establish a stockholder position, as illustrated by *Babbitt v. Pacco Investors Corp.*, 246 Or. 261, 270–71, 425 P.2d 489, 494 (1967):

"That the plaintiff had not paid for his shares is immaterial: *State ex rel. Anderson v. Frederickson*, 133 Wash 28, 233 P 291 [ (1925) ]; *Mitchell v. Beckman*, 64 Cal 117, 121, 28 P 110 [ (1883) ]; [4 Fletcher, Cyclopedia of Corporations p.] 40, § 1375. *Schwartz v. Manufacturers' Ins. Co.*, 335 Pa 130, 6 A2d 299, 122 ALR 1045 [ (1939) ], holds that payment is essential where the subscription is for shares of an existing corporation, but the opinion expressly recognizes that the rule is otherwise in the case of an original subscription for shares in a corporation to be formed. Neither is it necessary, in order for one to become a shareholder, that a certificate of stock, which is only evidence of ownership of an interest in the assets of the corporation, shall have been issued. A few among the numerous cases announcing this principle are cited in the margin." (Footnote omitted).

*See also Prejean v. Commonwealth for Community Change, Inc.*, 503 So.2d 661 (La.App.1987); *Bielinski v. Miller*, 118 N.H. 26, 382 A.2d 357 (1978); *M/V La Conte, Inc. v. Leisure*, 55 Wash.App. 396,

---

**1.** Mr. Snyder stated that he was present when the stockholders assembled, but left before any business was conducted. The minutes showed his presence throughout.

**2.** The reason for rejection is set out in Syllabus Point 4 of *Snyder:* "Before the contents of a lost paper can be properly given in evidence, it is not only necessary to prove that it is lost and that diligent search has been made to find it, but its due execution as well."

777 P.2d 1061 (1989). *See generally* 4 W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 1969 (1985 Revised Vol.).

The majority, in my judgment, has overruled Syllabus Point 2 of *Snyder:*

> "At a stockholder's meeting held for the purpose of organizing in pursuance of the certificate of incorporation, at which meeting all the stock is properly represented, one of the persons, appearing from the certificate of incorporation to be a stockholder, is elected director. *Held,* the corporation is thereby estopped from denying that such person so elected is a legally constituted and *bona fide* stockholder."

Although the majority asserts *Snyder* is distinguishable from the present case because some partial payment had been made, we do not find this fact in that opinion. What the *Snyder* opinion does suggest is that because the charter reflected that $5,000 had been initially paid in as capital, "from this it may be properly inferred that someone else paid the ten per cent. for the plaintiff." 65 W.Va. at 7, 63 S.E. at 618. This statement in *Snyder* is particularly significant in view of the statutory requirement at that time that to be included in the incorporation agreement, the incorporator had to pay "at least ten per cent. of the par value of the . . . stock" for which he had subscribed. 1887 W.Va. Code ch. 54, § 7 (1881).[3] The Court in *Snyder* was willing to assume from the fact that the corporation "charter show[ed] that $5,000 has been paid in, which is ten per cent. of the capital stock then subscribed," that Mr. Snyder's ten percent had been paid. 65 W.Va. at 6–7, 63 S.E. at 618.

We have much the same situation in the present case, although there is no longer a corporate statute requiring incorporators to pay at least ten percent of the value of their stock. The corporate charter, as earlier pointed out, reflects the initial paid-in capital of the corporation to be $1,000 or ten shares of the value of $100 each. The

charter also shows the names of the three incorporators and the division of the ten shares among them. Finally, the minutes of the first directors' meeting show that the board authorized the issuance of $1,000 worth of stock consisting of ten shares, with eight shares to be issued to Mary Lockhart and one share each to George W. Hodges and Neola Hodges. I submit that this documentation fully comports with the *Snyder* case and precludes challenge to the consideration for the two shares.

Even if one assumes that the consideration was open to dispute under *Snyder,* there was no dispute that George W. Hodges endorsed the corporate note for $300,000 payable to the former owner, John Smiley. Courts have recognized that where an individual becomes personally liable on a corporate loan, this may be sufficient consideration for receipt of stock in the corporation in the absence of fraud. In *Blish v. Thompson Automatic Arms Corp.,* 30 Del. Ch. 538, 64 A.2d 581 (1948), Thompson issued shares of its capital stock to another company which had pledged securities to enable Thompson to obtain a bank loan. A Thompson stockholder brought suit to compel cancellation of the stock transfer. In upholding the stock transfer, the Delaware Supreme Court stated:

> "Even though a corporation may not issue its shares of capital stock except for the purposes included under the constitutional and statutory provisions as indicated, nevertheless, we are unable to say that a portion of the services rendered, that is the pledging of securities with the Marine Midland Trust Company, were not such services as could be paid for by the issuance of stock." 30 Del.Ch. at 571–72, 64 A.2d at 598. (Citations omitted).

*See also Eastern Okla. Television Co., Inc. v. Ameco, Inc.,* 437 F.2d 138 (10th Cir.1971) (stock issued for guarantee for corporation obligation); *Rogers v. Dodge,* 243 Mass. 295, 137 N.E. 537 (1922) (stock

---

3. The full text of 1887 W.Va.Code ch. 54, § 7 is:

"No person shall be included as a corporator in any such agreement, by reason of any stock subscribed for by him, unless he has in

good faith paid to the person who may have been appointed or agreed upon to receive the same for the intended corporation, at least ten per cent. of the par value of the said stock."

for shareholder's continuing indebtedness on corporate notes as well as other services). *See generally* 11 W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 5197 (1986 Revised Vol.). In most of these cases, the statutes relative to the issuance of stock were similar to W.Va. Code, 31–1–28 (1923), which was in effect in 1967.[4]

Although the majority apparently relies on the statement at trial by John Smiley, to whom the corporate note was given, that he never intended to hold Mr. Hodges liable on the note, the note itself contained no such qualification. This Court stated in Syllabus Point 2 of *Tabler v. Hoult*, 110 W.Va. 542, 158 S.E. 782 (1931):

> "Parol evidence to prove an agreement between the maker and the payee of a note that the former should not be required to pay it, is inadmissible under the rule inhibiting the introduction of parol evidence to contradict, vary, add to or detract from the terms of a written instrument."

*Tabler* is also instructive as to the procedure used in this case. Here, the advisory jury was given several special instructions on the theory that they would answer questions of disputed fact. The plaintiff objected on the ground that those questions dealing with the consideration Mr. Hodges had paid for the stock were misleading and suggested that payment could only be made in cash. In *Tabler*, the court had instructed the jury to find for the defendant if they believed that he was never expected to pay for the note. We found this to be a clear error of law and reversed the case.

Unfortunately, the majority's failure to understand and apply these legal principles not only does a grave injustice to the parties in this case, but will frustrate the rights of other stockholders. I can only conclude that the majority has failed to understand the damage it has done to the business community when it refused to follow established corporate law.

I am authorized to state that Justice McHUGH joins me in this dissent.

---

**4.** The relevant portion of W.Va.Code, 31–1–28 (1923), is:

"The stockholders of any corporation may authorize the issuance of the authorized amount and number of its shares of stock and convertible securities in payment wholly or partly for cash, labor done, real and/or personal property, or for the use thereof, at such price for any such labor or property or the use thereof[.]"

The current provision, W.Va.Code, 31–1–82 (1974), states, in material part:

"The consideration for the issuance of shares may be paid, in whole or in part, in cash, in other property, tangible or intangible, or in labor or services actually performed for the corporation. When payment of the consideration for which shares are to be issued shall have been received by the corporation, such shares shall be deemed to be fully paid and nonassessable."